JOHN WALSHE MURRAY (074823)
STEPHEN T. O'NEILL (115132)
ROBERT A. FRANKLIN (091653)
THOMAS T. HWANG (218678)
DORSEY & WHITNEY LLP
305 Lytton Avenue
Palo Alto, CA 94301
Telephone: (650) 857-1717
Facsimile: (650) 857-1288
Email: murray.john@dorsey.com
Email: oneill.stephen@dorsey.com
Email: franklin.robert@dorsey.com
Email: hwang.thomas@dorsey.com

Attorneys for Debtors

# UNITED STATES BANKRUPTCY COURT

# NORTHERN DISTRICT OF CALIFORNIA

# SAN JOSE DIVISION

| | |
|---|---|
| In re:<br><br>**CLEAREDGE POWER, INC.**,<br>Employer Tax I.D. No. 20-0119415<br><br>**CLEAREDGE POWER, LLC**<br>Employer Tax I.D. No. 06-1517615<br><br>**CLEAREDGE POWER INTERNATIONAL SERVICE, LLC**<br>Employer Tax I.D. No. 27-3468551<br><br>Debtor(s).<br><br>920 Thompson Place, Suite 100<br>Sunnyvale, California 94085 | Case No. 14-51955-11-CN<br><br><br>Case No. 14-51956-11-CN<br><br><br>Case No. 14-51960-11-CN<br><br>Cases Jointly Administered<br>Under Chapter 11<br><br>Date: TBD<br>Time: TBD<br>Place: 280 S. First Street, Room 3070<br>San Jose, CA 95113<br>Judge: Honorable Charles Novack |

**MOTION FOR ORDER (A) AUTHORIZING DEBTORS TO MAINTAIN EXISTING BANK ACCOUNTS AND CONTINUE USE OF BUSINESS FORMS AND CHECKS, (B) AUTHORIZING DEBTORS TO CONTINUE USE OF PRE-PETITION CASH MANAGEMENT SYSTEM, (C) GRANTING ADMINISTRATIVE EXPENSE STATUS TO POST-PETITION INTERCOMPANY CLAIMS AND (D) FOR LIMITED RELIEF FROM AUTOMATIC STAY**

ClearEdge Power, Inc. ("CEP"), ClearEdge Power LLC ("CEP LLC") and ClearEdge Power

International Services LLC ("CEPIS" and collectively with CEP and CEP LLC, the "Debtors" or "Company"), the debtors and debtors in possession in these jointly administered cases, hereby file this motion (the "Motion" or the "Cash Management Motion") for interim and/or final orders authorizing the continued use of the Debtors' existing banking accounts, cash management system and intercompany arrangements and historical practices, or, alternatively, finding that such continued use is within the ordinary course of business of the Debtors within the meaning of 11 U.S.C. § 363(c)(1) and 364(a).  The Motion is made on the grounds that such continued use is necessary for the Debtors' continued operations.  The Motion is based on the Memorandum of Points and Authorities set forth herein, the DECLARATION OF DAVID B. WRIGHT IN SUPPORT OF FIRST DAY MOTIONS AND APPLICATIONS ("Omnibus Declaration") filed concurrently herewith, the pleadings and papers on file herein, and such other oral or documentary evidence as may be submitted before the Court.

In support of the Motion, the Debtors respectfully represent the following:

### I.  JURISDICTION

1.  The Court has jurisdiction over the matter pursuant to 28 U.S.C. §§ 157 and 1334. This matter is a core proceeding within the meaning of 28 U.S.C. § 157(b)(2). Venue is proper pursuant to 28 U.S.C. §§ 1408 and 1409.

2.  The statutory basis for the relief requested herein is Bankruptcy Code §§ 105, 363, 364 and 553 and Rules 6003 and 6004(h) of the Federal Rules of Bankruptcy Procedure (the "Bankruptcy Rules")

### II.  SUMMARY OF RELIEF SOUGHT

3.  The Debtors seek an order: (i) authorizing continued use of the Cash Management System (defined below), including the Intercompany Transfers (defined below); (ii) authorizing the Debtors to maintain their bank accounts (the "Bank Accounts") as are listed on **Exhibit "A"** hereto; (iii) authorizing the Debtors to continue the Credit Card Program, including use of the credit cards in the ordinary course of the Company's business and limited relief from the automatic stay and other conditions to continue use of the Credit Card Program; (iv) authorizing the Debtors to continue using their existing business forms and checks; (v) granting administrative expense status to postpetition

intercompany claims; and (vi) to the extent applicable, waiving of any stay provided by Bankruptcy Rule 6004(h). The Debtors request expedited or interim relief under Bankruptcy Rule 6003 as immediate relief is necessary to avoid immediate and irreparable harm to the estates.

### III. MOTION

#### A. Bankruptcy Filing

4. On May 1, 2014, (the "Petition Date"), each of the Debtors filed voluntary petitions under Chapter 11 of the Bankruptcy Code. The Debtors are presently operating their business as debtors in possession pursuant to the provisions of 11 U.S.C. §§ 1107 and 1108. On May 2, 2014, the Court entered its ORDER AUTHORIZING AND DIRECTING JOINT ADMINISTRATION OF ESTATES pursuant to which the Court ordered these estates to be jointly administered.

5. No official committee of unsecured creditors ("Committee") has been formed in the bankruptcy case to date.

#### B. History And Relevant Facts

6. A detailed discussion of the Debtors' history, description of its business, its assets and liabilities and the events that led to its need for bankruptcy relief are set forth in the Omnibus Declaration filed concurrently herewith and incorporated herein by reference. Only facts directly relevant to this Motion are restated herein.

7. The Company designs, manufactures, sells and services combined heat and power distributed generation fuel cell systems for commercial, industrial, utility and residential applications. The Company's fuel cell systems integrate proprietary components and utilize an innovative, moderate-temperature phosphoric acid fuel cell ("PAFC") technology to cleanly convert natural gas to electricity and heat at the point of use, through an ultra-clean electrochemical process. The systems can operate during a utility grid outage and can also be configured to operate completely independent of the grid, therefore providing a highly reliable and clean source of electricity and heat to a customer's facility. The generated electricity provides electric power that is both economically competitive and more reliable than electricity from the grid, while the generated heat is used by customers to further reduce operating expenses. The Company's systems deliver a lower lifetime cost of energy than current grid prices and include a highly efficient fuel cell stack

with a proven, industry-leading 10-year cell stack life that reduces service costs with extended operational life.

8. Based in Sunnyvale, California, CEP operates as the Company's headquarter office. CEP LLC maintains an engineering facility in Hillsboro, Oregon and a major manufacturing and engineering hub in South Windsor, Connecticut, along with satellite offices in Southern California. CEPIS, which is based in Connecticut, manages the Company's international business, specifically its business in South Korea. CEPIS is a wholly-owned subsidiary CEP LLC, and CEP LLC is a wholly-owned subsidiary of CEP.

9. In connection with the acquisition of UTC Power, the Company effected a reorganization whereby the majority of its debts, liabilities and assets, including the acquired liabilities and assets of UTC Power, were consolidated into CEP LLC as the operating company. As a result, the majority of the Company's assets and obligations are held by CEP LLC with the majority of the balance shared among the other two Debtor entities[1]. Historically, the Company has prepared consolidated financial statements for the all of its affiliated companies.

10. The Company has historically experienced strong growth and has been the leader in the field of stationary fuel cell systems. However, instability within the industry, together with constraints on working capital and an over-leveraged balance sheet, have resulted in the Company's financial distress. In recent months, the Company has been unsuccessful in obtaining additional financing to continue operations as a going concern. As the Company's available cash has waned, it has been unable to satisfy its payables. In order to streamline operations, among other things, the Company laid off the majority of its workforce prior to the Petition Date.

11. After considering numerous options over several weeks, the Company's board of directors decided that it was in the best interests of the Company's creditors and equity holders to consummate some form of sale, merger, acquisition and/or related transaction (a "<u>Transaction</u>"). Unable to meet its growing debt obligations, the Company decided to file for bankruptcy to provide the Company time to restructure its finances and operations, market its assets, negotiate sale terms,

---

[1] At the commencement of their bankruptcy cases, the Debtors each filed identical LISTS OF CREDITORS HOLDING 20 LARGEST UNSECURED CLAIMS and CREDITOR MAILING MATRICES. The Debtors are in the process of determining which assets and liabilities fall under which Debtor(s).

and conduct an auction of its assets to the highest bidder, under the auspices and protection of the Bankruptcy Court.

12. The Company believes that it is well-positioned to consummate a Transaction for its assets and that the ultimate purchaser will realize significant short term and long term value, especially because the Company maintains the ability to potentially scale dramatically within the context of sufficient working capital and a stronger balance sheet.

13. Accordingly, during their bankruptcy cases, the Debtors intend, among other things, to market their assets and consummate such a Transaction, and to then distribute proceeds of such transaction to creditors in accordance with the priorities set forth in the Bankruptcy Code. In order to ensure that their assets realize a maximum return from a Transaction, the Debtors must maintain their business operations as a going concern during the marketing and sale process. Consequently, in order to ensure that the Company's operations are not disrupted, the Debtor has filed, together with other "first day motions", this Cash Management Motion.

### C. The Cash Management System

14. In the ordinary course of business, the Company maintains a cash management system that provides well-established processes for the collection, concentration, management, disbursement and investment of funds generated and used in its operations (the "<u>Cash Management System</u>"). The Cash Management System is a centralized process specifically designed to accommodate the Company's lenders and customers.

15. The Cash Management System has several key components: (a) cash collection, primarily from its customers; (b) cash concentration from these accounts into a master operating account from which disbursements are made; (c) restricted deposit account held as security for letters of credit; and (d) various other deposit accounts held for general or other specified uses.

16. The Cash Management System consists, *inter alia,* of (a) two (2) restricted bank accounts (collectively, the "<u>Lender Restricted Bank Accounts</u>") which are used to receive incoming payments from certain customers; (b) an account held at Mellon Bank (the "<u>Mellon Bank Account</u>") which is used to receive incoming payments from all other customers; (c) a master operating account (the "<u>Master Operating Account</u>") from which most disbursements are made; (d) an operating

account (the "Oregon Operating Account") from which disbursements are made with respect to the Oregon manufacturing facility; (e) a restricted account (the "Wells Fargo LC Bank Account") held at Wells Fargo Bank, National Association ("Wells Fargo")[2] which is used to hold funds as security for letters of credit issued by Wells Fargo and as a deposit reserve for the Company's credit card program; (f) a general holding account and special disbursement accounts; and (g) several operating accounts held by CEPIS in South Korea. A complete list of the Bank Accounts is attached as **Exhibit "A"** and are more completely described below.

17. Periodically, the Company transfers funds from the Master Operating Account to the Oregon Operating Account and has in the past transferred amounts directly to the non-debtor affiliate in South Korea to finance operations (collectively, the "Intercompany Transfers"). No such transfers have occurred for some time, and no claims are outstanding from the South Korea affiliate. The Intercompany Transfers are reflected on the consolidated balance sheet.

### 1. The Lender Restricted Bank Accounts

18. The Lender Restricted Bank Accounts are used to receive remittances from certain of the Company's customers whose product was funded by lenders. One of the Lender Restricted Bank Accounts is a "lockbox" account (the "Talmer Bank Account") held at Talmer Bank and Trust ("Talmer") to secure the Company's obligations under certain loan documents executed with Talmer (the "Talmer Loan Documents"). There are approximately twelve (12) customers which are directed by the Company to remit payments to the Talmer Bank Account. Talmer withdraws amounts sufficient to satisfy the Debtors' monthly payment obligations under the Talmer Loan Documents. The balance of the funds in the Talmer Bank Account are then transferred to the Master Operating Account, which is held in the name of CEP LLC.

19. The second Lender Restricted Bank Account consists of two deposit accounts held at

---

[2] As set forth in Dorsey & Whitney's ("Dorsey") Application for Employment (the "Application"), Dorsey has represented Wells Fargo on unrelated matters and disclosed Wells Fargo as a connection. Dorsey is presently unaware of any such conflicts. However, Wells Fargo's counsel has pointed out that there may be disputes. The Application sets forth that in the event a dispute exists or arises in the Chapter 11 cases between the Company and a creditor or claimant represented by Dorsey in an unrelated matter, Dorsey will not represent either party against the other relative to any dispute related to the Chapter 11 cases without first obtaining both parties' consent to the terms and conditions of our representation. Here, in an abundance of caution, the Debtors will retain separate counsel to represent it in all matters relating to Wells Fargo.

Wells Fargo in the name of a non-debtor affiliate denoted as DACA[3] accounts (the "<u>DACA Account</u>") to secure a note payable to REF Investments (the "<u>REF Note</u>"). Remittances by customers which are subject to the REF Note are directed to a DACA Account, from which payments on the REF Note are made. The balance is then transferred to the Master Operating Account, less a specified amount, which is directed to a second DACA Account and held as a reserve to fund service operations on the applicable product.

### 2. The Mellon Account

20. All other customer payments are directed to a "lockbox" at the Mellon Account. The Company then transfers those amounts to the Master Operating Account on a weekly basis.

### 3. The Master Operating Account and the Oregon Operating Account

21. The Master Operating Account is held at Chase Bank in the name of CEP LLC. This is the account from which all disbursements are made. The Cash Management System and control of all disbursements is managed from the Sunnyvale office by the Company's corporate controller.

22. The Oregon Operating Account is held at Wells Fargo Bank in the name of CEP and is used to fund operations at the Oregon office.[4]

### 4. The Wells Fargo LC Bank Account

23. The Wells Fargo LC Bank Account is a restricted account held in the name of CEP and is used to secure letters of credit issued by Wells Fargo in favor of two of the Company's landlords and an equipment lessor. In addition, Wells Fargo also holds a $225,000 deposit in this account as a reserve to secure the Company's corporate credit card program (the "<u>Credit Card Program</u>")[5]. On April 30, 2014, Wells Fargo notified the Company that it was reducing the credit limit on the Credit Card Program to $100,000 and gave a 30-day notice that it would be canceling the program, effective June 1, 2014. The Debtors have requested Wells Fargo to advance credit

---

[3] DACA represents a deposit account control agreement.

[4] The Oregon Operating Account was also subject to a deposit account control agreement with Kohlberg Investments, the Debtors' principal investor, to secure a note; however, the debt under the note was converted into equity in early 2013 and the DACA was terminated.

[5] The corporate credit cards are primarily used by the Company's service engineers to obtain parts or other supplies to service the Company's customers. Continued and uninterrupted use of the Credit Card Program is necessary to timely perform these services.

pursuant to the terms of the Credit Card Program and anticipate negotiating with Wells Fargo to extend that period.

### 5. Other Accounts

24. Other accounts include a holding account at East West Bank, a recently opened operating account at Wells Fargo which has not yet been funded, special purpose accounts used to pay permit fees or other related installation costs, a money market account held at Wells Fargo and four (4) accounts held by CEPIS in South Korea (the "<u>South Korea Accounts</u>") to receive customer payments and to pay employees and other business operations in South Korea. (collectively, the "<u>Other Accounts</u>"). All of the Bank Accounts are identified on Exhibit "A" hereto.

## IV. MEMORANDUM OF POINTS AND AUTHORITIES

### A. The Debtors Should Be Permitted To Maintain Their Cash Management System And Bank Accounts.

25. The Bank Accounts and the Cash Management System are well-suited to the Debtors' business needs and operations. Indeed, it is vital to the Company's operations that its customers continue to remit payments to the appropriate deposit accounts without disruption caused by the closing of these accounts. To require the Debtors to close the Bank Accounts and reestablish new accounts would require considerable time and expense to the Debtors' estates, particularly considering that its customers have been directed to deposit remittances in the Lender Restricted Bank Accounts and the Mellon Account. Similarly, continued use of the Master and Oregon Operating Accounts and the Wells Fargo LC Bank Account, including the Credit Card Program, are vital to the Debtors' operations. Permitting the Debtors to continue using their existing Bank Accounts is essential to a smooth and orderly transition of the Debtors into chapter 11 and to avoid disruption of their business and operations.

26. Bankruptcy Courts treat requests for authority to continue utilizing existing cash management systems as a relatively "simple matter." *In re Baldwin-United Corp.*, 79 B.R. 321, 327 (Bankr. S.D. Ohio 1987). This is particularly true where, as here, a chapter 11 case involves affiliated debtors with complex financial affairs. In *In re Charter Co.*, 778 F.2d 617 (11th Cir. 1985), for example, the Bankruptcy Court entered an order authorizing the debtor and 43 of its subsidiaries

"to continue to consolidate the management of their cash as has been usual and customary in the past, and to transfer monies from affiliated entity to entity, including operating entities that are not debtors." *Id*. at 620. The Eleventh Circuit Court of Appeals then affirmed a subsequent District Court decision denying a creditor's motion for leave to appeal the bankruptcy court's cash management order, holding that authorizing the debtors to utilize their pre-petition "routine cash management system" was "entirely consistent" with applicable provisions of the Bankruptcy Code. *Id.* at 621. This was so even though the debtor made transfers of sums to affiliated, non-debtor entities.

27. Here, maintenance of the Cash Management System will enable the Debtors to maintain their relationships with their customers and lenders and will facilitate continued operations. Indeed, failure to maintain the Cash Management System may lead to defaults with lenders and the Debtors' inability to service its customers which may in turn lead to diminished revenues and increased debt to the detriment of creditors and the estates.

28. For similar reasons, the Debtors should be authorized to continue to fund their business and operations by payments and disbursements made from the Bank Accounts and should be exempt from certain of the Guidelines established by the Office of the United States Trustee for Region 17 (the "<u>Guidelines</u>[6]"). Maintenance of the Lender Restricted Bank Accounts, the Mellon Account, the Master Operating Account, the Oregon Operating Account, the Wells Fargo LC Bank Account and the South Korea Accounts are especially essential to the Debtors' operations. Closing these accounts may lead to defaults in applicable loan documents and will cause confusion and disruption to customers in remitting payments, receipt of which is vital to the Debtor's operations and will hinder continued production and vital services provided by the Company to its customers. It is thus critical, both to the continuity of the Debtors' business operations and to the preservation of the value of the business, that the Debtors be allowed to continue to utilize their existing Cash

---

[6] The Guidelines were issued to assist the U.S. Trustee in supervising the administration of chapter 11 cases. Such Guidelines require, unless the bankruptcy court requires otherwise, chapter 11 debtors to, among other things,

    a. Close all existing bank accounts and open new accounts which must be designated debtor-in-possession bank accounts.

    b. Establish and maintain separate debtor-in-possession accounts for the payment of taxes.

Management System without disruption. Disrupting these cash management procedures and closing the Bank Accounts would severely impair the Debtors' ability to preserve and enhance their value and to successfully reorganize during these Chapter 11 Cases. Accordingly, the Debtors respectfully submit that allowing the Debtors' continued use of the Bank Accounts will preserve business continuity and is in the best interests of employees, creditors, vendors and customers.

29. As part of the requested relief, the Debtors also seek a waiver of the requirement to establish specific bank accounts for tax payments. The Debtors believe that tax obligations can be paid most efficiently out of the existing Bank Accounts, that the U.S. Trustee can adequately monitor the flow of funds into, among, and out of the Bank Accounts through the Debtors' required monthly operating reports, and that the creation of new debtor-in-possession accounts designated solely for tax obligations would be unnecessary and inefficient.

30. It is vital for the Debtors' operations that their service engineers and other field representatives be able to use the Credit Card Program in order to timely deliver service and installation services to their customers. Such continued services are vital to maintain the going concern value of the Debtors and their assets. The Debtors have requested Wells Fargo to extend credit to the Debtors pursuant to the terms of the Credit Card Program.

31. The Debtors hereby request authority to maintain the Bank Accounts as identified on **Exhibit "A"** hereto and utilize them pursuant to the existing Cash Management System described above. The Debtors do not believe that allowing them to do so will prejudice their estates or any party-in-interest. If the relief requested herein is granted, the Debtors will not pay any debts incurred before the Petition Date unless specifically authorized by this Court pursuant to a separate motion.

32. The Debtors further request that all banks where the Debtors maintain Bank Accounts be authorized to: (a) continue to service and administer the Bank Accounts in the manner maintained prior to the Petition Date without interruption and in the usual and ordinary course; (b) be granted limited relief from the automatic stay to continue to deduct, without further order from this Court, from the appropriate Bank Accounts the bank's customary fees and expenses associated with the nature of the deposit or cash management or custodial services

rendered to the Debtors; and (c) receive, process, honor, and pay any and all checks, drafts, or wires issued or initiated by the Debtors, and drawn on the Bank Accounts by the holders or makers thereof, as the case may be; provided, however, that any check drawn or issued by the Debtors before the Petition Date may be honored by any bank only if the underlying payment is authorized by separate order of this Court.

33. The Debtors also request that the Court order that, except for those checks that may be honored and paid to comply with any order of this Court authorizing payment of certain prepetition claims (the "<u>Prepetition Claims Checks</u>"), no checks or drafts issued on any Bank Accounts before the Petition Date but presented for payment after the Petition Date be honored or paid. In order to minimize confusion, the Debtors intend to provide the Banks with a list of outstanding prepetition checks identifying the Prepetition Claims Checks within three (3) business days of the entry of the order authorizing such Prepetition Claims Checks so that it is clear which checks may be paid.

34. Subject to section 553 of the Bankruptcy Code, all banks that maintain the Bank Accounts should be prohibited from offsetting, affecting, freezing, or otherwise impeding the Debtors' use of any funds deposited in the Bank Accounts on account of, or by reason of, any claim (as defined in Bankruptcy Code section 101(5)) of any such bank against the Debtors that arose before the Petition Date, absent further order of the Court.

**B.  The Debtors Should Be Permitted To Continue Intercompany Transactions Which Should Be Afforded Administrative Priority Expense Status.**

35. As described above, under the Cash Management System, the Debtors enter into certain Intercompany Transactions with each other in the ordinary course of their business. The Intercompany Transactions allow the Debtors, among other things, to meet the needs of their customers and vendors efficiently in a cost-effective manner through the centralization of key administrative functions. If these Intercompany Transactions are discontinued, the Debtors' cash management process would be disrupted causing irreparable harm to the Debtors. In particular, it is imperative that the Debtors maintain the ability, as debtors-in-possession, to make intercompany transfers to each other to ensure that they are able to operate smoothly and that their ability to

serve customers is in no way interrupted.

36. As set forth above, the Debtors believe that continuation of the practices under the Cash Management Program is in the ordinary course of business and that the Debtors are authorized to continue to enter into the Intercompany Transactions under section 363(c)(1) without any order of the Court. In an abundance of caution, the Debtors bring this Motion seeking confirmation that such practices under the Cash Management Program are ordinary course practices, or alternatively, that such Intercompany Transfers should be authorized under section 364(a). The Debtors also requests this Court, if appropriate, to set a final hearing on this matter.

C. **Bankruptcy Rule 6003 Has Been Satisfied And A Waiver Of The Stay Under Bankruptcy Rule 6004(h) Is Appropriate.**

37. Bankruptcy Rule 6003 provides:

> Except to the extent that relief is necessary to avoid immediate and irreparable harm, the court shall not, within 21 days after the filing of the petition, grant relief regarding the following: …(b) a motion to use, sell, lease, or otherwise incur an obligation regarding property of the estate, including a motion to pay all or part of a claim that arose before the filing of the petition, but not a motion under Rule 4001.

38. To the extent it is applicable, Bankruptcy Rule 6003 has been satisfied. Because of the complexity of the Debtors' operations, any disruption to the Cash Management System would seriously harm the Debtors and their estates. Without the Cash Management System, the Debtors would be unable to receive payments from customers, pay their secured lenders and make disbursements from their operating accounts. This would cause diminution in the value of the Debtors' estates to the detriment of all parties in interest. Accordingly, the Debtors respectfully submit that they have satisfied the "immediate and irreparable harm" standard of Rule 6003 of the Bankruptcy Rules and seek authority to continue to operate the Cash Management System in the ordinary course of business..

39. The Debtors further seek a waiver of any stay of the effectiveness of the order approving this Motion. Pursuant to Bankruptcy Rule 6004(h), '[a]n order authorizing the use , sale, or lease of property other than cash collateral is stayed until the expiration of fourteen (14) days after the entry of the order, unless the court orders otherwise." As set forth above, the relief requested is

appropriate under the circumstances and under Bankruptcy Rules 6003 and 6004(h).

**WHEREFORE**, the Debtors pray that this Court enter its order as follows:

1. Finding that the Debtor's continued use of the Cash Management System is in the ordinary course of business within the meaning of 11 U.S.C. § 363(d)(1);

2. Authorizing, but not directing, the Debtors to continue to utilize the Cash Management System, including, but not limited to, the Intercompany Transactions, in the ordinary course of its business;

3. Authorizing, but not directing, the Debtors to maintain the Bank Accounts, including the Lender Restricted Bank Accounts, the Mellon Account, the Master Operating Account, the Oregon Operating Account, the Wells Fargo LC Bank Account and other accounts as are listed on **Exhibit "A"** hereto, and waiving any requirement under the Guidelines to close such accounts or to open a separate tax account;

4. Authorizing the Debtors to continue using their existing business forms and checks;

5. Authorizing the Debtors to continue use of the Credit Card Program, including use of the corporate credit cards in the ordinary course of their businesses;

6. Authorizing all banks where the Debtors maintain Bank Accounts to: (a) continue to service and administer the Bank Accounts in the manner maintained prior to the Petition Date without interruption and in the usual and ordinary course; (b) continue to deduct, without further order from this Court, from the appropriate Bank Accounts the bank's customary fees and expenses associated with the nature of the deposit or cash management or custodial services rendered to the Debtors; and (c) receive, process, honor, and pay any and all checks, drafts, or wires issued or initiated by the Debtors, and drawn on the Bank Accounts by the holders or makers thereof, as the case may be; provided, however, that any check drawn or issued by the Debtors before the Petition Date may be honored by any bank only if the underlying payment is authorized by separate order;

7. Granting administrative expense status to post-petition Intercompany Transfers; and

///

///

///

8. For such other and further relief as the Court deems just and proper.

Dated: May 6, 2014              **DORSEY & WHITNEY LLP**


By: /s/ Robert A. Franklin
    Robert A. Franklin
    Attorneys for Debtors