JOHN WALSHE MURRAY (074823)
STEPHEN T. O'NEILL (115132)
ROBERT A. FRANKLIN (091653)
THOMAS T. HWANG (218678)
DORSEY & WHITNEY LLP
305 Lytton Avenue
Palo Alto, CA 94301
Telephone: (650) 857-1717
Facsimile: (650) 857-1288
Email: murray.john@dorsey.com
Email: oneill.stephen@dorsey.com
Email: franklin.robert@dorsey.com
Email: hwang.thomas@dorsey.com

Attorneys for Debtors

# UNITED STATES BANKRUPTCY COURT

## NORTHERN DISTRICT OF CALIFORNIA

### SAN JOSE DIVISION

| | |
|---|---|
| In re:<br><br>**CLEAREDGE POWER, INC.**,<br>Employer Tax I.D. No. 20-0119415<br><br>**CLEAREDGE POWER, LLC**<br>Employer Tax I.D. No. 06-1517615<br><br>**CLEAREDGE POWER INTERNATIONAL SERVICE, LLC**<br>Employer Tax I.D. No. 27-3468551<br><br>Debtor(s).<br><br>920 Thompson Place, Suite 100<br>Sunnyvale, California 94085 | Case No. 14-51955-CN-11<br><br>Case No. 14-51956-CN-11<br><br>Case No. 14-51960-CN-11<br><br>Cases Jointly Administered<br>Under Chapter 11 |

**OMNIBUS DECLARATION OF DAVID B. WRIGHT IN SUPPORT OF FIRST DAY MOTIONS**

I, David B. Wright, declare:

1. I am the Chief Executive Officer of ClearEdge Power, Inc., an Oregon Corporation ("CEP Inc.") and ClearEdge Power, LLC, fka ClearEdge Power Corporation, fka UTC Power Corporation, a Delaware Limited Liability Company ("CEP LLC"), which is the sole manager and owner of ClearEdge Power International Service, LLC, a Delaware Limited Liability Company

("CEPIS" and together with CEP Inc. and CEP LLC, the "Debtors" or the "Company"). I have personal knowledge of the facts set forth in this Declaration and if called upon to testify, I would and could competently testify to the following.

2. This Declaration is filed in support of the following motions (collectively, the "First Day Motions") filed concurrently herewith for which the Debtors have requested a hearing on shortened notice to parties through a separate motion to the Court:

    i.    MOTION FOR ORDER (A) AUTHORIZING DEBTORS TO MAINTAIN EXISTING BANK ACCOUNTS AND CONTINUE USE OF BUSINESS FORMS AND CHECKS, (B) AUTHORIZING DEBTORS TO CONTINUE PRE-PETITION CASH MANAGEMENT SYSTEM, (C) GRANTING ADMINISTRATIVE EXPENSE STATUS TO POST-PETITION INTERCOMPANY CLAIMS, AND (D) FOR LIMITED RELIEF FROM AUTOMATIC STAY (the "Cash Management Practices Motion");

    ii.    MOTION FOR ORDER AUTHORIZING THE DEBTOR TO (I) HONOR PREPETITION EMPLOYEE WAGES, AND CONTRIBUTIONS TO EMPLOYEE BENEFIT PLANS; AND (II) FOR THE DEBTOR, BANKS, AND OTHER FINANCIAL INSTITUTIONS TO COMPLY WITH PROCEDURES RELATING THERETO (the "Employee Benefit Motion"); and

    iii.    MOTION FOR INTERIM AND FINAL ORDERS (I) PROHIBITING UTILITIES FROM ALTERING, REFUSING, OR DISCONTINUING SERVICE; (II) DEEMING UTILITIES ADEQUATELY ASSURED OF PAYMENT; AND (III) ESTABLISHING PROCEDURES FOR DETERMINING REQUESTS FOR ADDITIONAL ADEQUATE ASSURANCE OF PAYMENT (the "Utilities Motion").

3. The Debtors commenced these Chapter 11 cases on May 1, 2014 (the "Petition Date"). The Debtors are operating their business as a debtor in possession pursuant to the provisions of 11 U.S.C. §§ 1107 and 1108.

## I.    GENERAL BACKGROUND OF THE COMPANY

### A.    The Company

4. Founded initially in 2003 as Quantum Leap Technology before changing its name to ClearEdge Power in 2005, the Company designs, manufactures, sells and services combined heat and power distributed generation fuel cell systems for commercial, industrial, utility and residential applications. The Company's fuel cell systems integrate proprietary components and utilize an innovative, moderate-temperature phosphoric acid fuel cell ("PAFC") technology to cleanly convert natural gas to electricity and heat at the point of use, through an ultra-clean electrochemical process.

The systems can operate during a utility grid outage and can also be configured to operate completely independent of the grid, therefore providing a highly reliable and clean source of electricity and heat to a customer's facility. The generated electricity provides electric power that is both economically competitive and more reliable than electricity from the grid, while the generated heat is used by customers to further reduce operating expenses. The Company's systems deliver a lower lifetime cost of energy than current grid prices and include a highly efficient fuel cell stack with a proven, industry-leading 10-year cell stack life that reduces service costs with extended operational life.

5. The Company's fuel cell systems therefore feature three key elements: (a) reduced utility expenses with an attractive economic payback, (b) improved corporate sustainability through reduced greenhouse gas emissions, and (c) highly reliable backup power capability to keep critical operations running.

6. In early 2013, CEP Inc. acquired UTC Power, Inc. ("UTC Power"), formerly a subsidiary of United Technologies Corporation, largely to leverage UTC Power's advanced, large-scale PAFC technology which UTC Power had developed over a 50 year period. In addition to leveraging over five decades of expertise in the fuel cell industry, the Company's strategic decision to acquire UTC Power resulted in the Company's ownership of the industry's largest portfolio of intellectual property.

7. Since its inception, the Company has grown to one of the leading fuel cell companies in the industry, having established long-standing relationships with a broad and diverse range of customers across a variety of industries and geographies, in addition to partners and distributors globally. The Company's commercial and industrial sector customers include: Verizon, Samsung, CBS, First National Bank, Whole Foods Market, Coca-Cola, University of Connecticut, Saint Francis Hospital, Adventist Health, and Roche Pharmaceuticals. The Company also has several important utility sector customers which include: San Diego Gas & Electric and New York Power Authority in the U.S., and, GS Power, SK E&S, and Korea Southeast Power in South Korea.

**B.    Company Structure**

8. Based in Sunnyvale, California, CEP Inc. operates as the Company's headquarter

office. CEP LLC maintains an engineering facility in Hillsboro, Oregon and a major manufacturing and engineering hub in South Windsor, Connecticut, along with satellite offices in Southern California. CEPIS, which is based in Connecticut, manages the Company's international business, specifically its business in South Korea. CEPIS is a wholly-owned subsidiary of CEP LLC, and CEP LLC is a wholly-owned subsidiary of CEP Inc.

9. In connection with the acquisition of UTC Power, the Company effected a reorganization whereby the majority of its debts, liabilities and assets, including the acquired liabilities and assets of UTC Power, were consolidated into CEP LLC as the operating company. As a result, the majority of the Company's assets and obligations are held by CEP LLC with the majority of the balance shared among the three Debtor entities. Historically, the Company has prepared consolidated financial statements for its affiliated companies.

### C. Recent Financial Performance

10. The Debtors' consolidated balance sheet for the fiscal quarter ending March 31, 2014 lists assets of $189,371,952, liabilities of $129,339,076 and stockholder's equity of $60,031,876. In fiscal 2013, the Debtor had revenues of $69,287,000.

### D. Events Precipitating Commencement of Bankruptcy Case.

11. The Company has historically experienced strong growth and has been the leader in the field of stationary fuel cell systems. However, instability within the industry, together with constraints on working capital, has resulted in the Company's financial distress. In recent months, the Company has been unsuccessful in obtaining additional financing to continue operations as a going concern. As the Company's available cash has waned, it has been unable to satisfy its payables. In order to streamline operations, among other things, the Company laid off the majority of its workforce prior to the Petition Date.

12. After considering numerous options over several weeks, the Company's board of directors decided that it is in the best interests of the Company's creditors and equity holders to consummate some form of sale, merger, acquisition and/or related transaction (a "Transaction"). Unable to meet its growing debt obligations, the Company made a strategic decision to file for bankruptcy to provide the Company time to restructure its finances and operations, market its assets,

negotiate sale terms, and conduct an auction of its assets to the highest bidder, under the auspices and protection of the Bankruptcy Court. As a result, each of the Debtors filed their Voluntary Petition on the Petition Date, commencing these Chapter 11 cases.

## II. THE DEBTOR'S BUSINESS PLAN AND FIRST DAY MOTIONS

13. The Company believes that it is well-positioned to consummate a Transaction for its assets and that the ultimate purchaser will realize significant short term and long term value, especially because the Company maintains the ability to potentially scale dramatically within the context of sufficient working capital and a stronger balance sheet.

14. Accordingly, during their bankruptcy cases, the Debtors intend, among other things, to market their assets and consummate such a Transaction, and to then distribute proceeds of the Transaction to creditors in accordance with priorities set forth in the Bankruptcy Code.

15. In order to ensure that their assets realize a maximum return from a Transaction, the Debtors believe that they must maintain their business operations as a going concern during the marketing and sale process. Consequently, in order to ensure that the Company's operations are not disrupted, the Debtors are filing the First Day Motions at the onset of their bankruptcy cases (collectively, the "First Day Motions"), the supporting facts of which are set forth below.

### E. Cash Management Practices Motion

16. In the ordinary course of business, the Company maintains a cash management system that provides well-established processes for the collection, concentration, management, disbursement and investment of funds generated and used in its operations (the "Cash Management System"). The Cash Management System is a centralized process specifically designed to accommodate the Company's lenders and customers.

17. The Cash Management System has several key components: (a) cash collection, primarily from its customers; (b) cash concentration from these accounts into a master operating account from which disbursements are made; (c) restricted deposit account held as security for letters of credit; and (d) various other deposit accounts held for general or other specified uses.

18. The Cash Management System consists, *inter alia,* of (a) two (2) restricted bank accounts (collectively, the "Lender Restricted Bank Accounts") which are used to receive incoming

payments from certain customers; (b) an account held at Mellon Bank (the "Mellon Bank Account") which is used to receive incoming payments from all other customers; (c) a master operating account (the "Master Operating Account") from which most disbursements are made; (d) an operating account (the "Oregon Operating Account") from which disbursements are made with respect to the Oregon manufacturing facility; (e) a restricted account (the "Wells Fargo LC Bank Account") held at Wells Fargo Bank, National Association ("Wells Fargo") which is used to hold funds as security for letters of credit issued by Wells Fargo and as a deposit reserve for the Company's credit card program; (f) a general holding account and special disbursement accounts; and (g) several operating accounts held by CEPIS in South Korea. A complete list of the Bank Accounts is attached as Exhibit "A" to the Cash Management Practices Motion and are more completely described below.

19. Periodically, the Company transfers funds from the Master Operating Account to the Oregon Operating Account and has in the past transferred amounts directly to the non-debtor affiliate in South Korea to finance operations (collectively, the "Intercompany Transfers"). No such transfers have occurred for some time, and no claims are outstanding from the South Korea affiliate. The Intercompany Transfers are reflected on the consolidated balance sheet.

20. The Lender Restricted Bank Accounts are used to receive remittances from certain of the Company's customers whose product was funded by lenders. One of the Lender Restricted Bank Accounts is a "lockbox" account (the "Talmer Bank Account") held at Talmer Bank and Trust ("Talmer") to secure the Company's obligations under certain loan documents executed with Talmer (the "Talmer Loan Documents"). There are approximately twelve (12) customers which are directed by the Company to remit payments to the Talmer Bank Account. Talmer withdraws amounts sufficient to satisfy the Debtors' monthly payment obligations under the Talmer Loan Documents. The balance of the funds in the Talmer Bank Account are then transferred to the Master Operating Account, which is held in the name of CEP LLC.

21. The second Lender Restricted Bank Account consists of two deposit accounts held at Wells Fargo in the name of a non-debtor affiliate denoted as DACA[1] accounts (the "DACA Account") to secure a note payable to REF Investments (the "REF Note"). Remittances by

---
[1] DACA represents a deposit account control agreement.

RAF:sb
H:\Client Matters\- F&R\ClearEdge\Pl\CE Inc\1st Day\Omnb\Dec v4.docx
6
OMNIBUS DECLARATION OF DAVID B. WRIGHT
IN SUPPORT OF FIRST DAY MOTIONS

Case: 14-51955   Doc# 24   Filed: 05/06/14   Entered: 05/06/14 17:15:54   Page 6 of 12

customers which are subject to the REF Note are directed to a DACA Account, from which payments on the REF Note are made. The balance is then transferred to the Master Operating Account, less a specified amount, which is directed to a second DACA Account and held as a reserve to fund service operations on the applicable product.

22. All other customer payments are directed remit payments to a "lockbox" at the Mellon Account. The Company then transfers these deposits to the Master Operating Account on a weekly basis.

23. The Master Operating Account is held at Chase Bank in the name of CEP LLC. This is the account from which all disbursements are made. The Cash Management System and control of all disbursements is managed from the Sunnyvale office by the Company's corporate controller.

24. The Oregon Operating Account is held at Wells Fargo Bank in the name of CEP. It is used to fund operations at the Oregon office. The Oregon Operating Account was also subject to a deposit account control agreement with Kohlberg Investments, the Debtors' principal investor, to secure a note; however the debt evidenced under the note was converted into equity in early 2013 and the DACA was terminated.

25. The Wells Fargo LC Bank Account is a restricted account held in the name of CEP and is used to secure letters of credit issued by Wells Fargo in favor of two of the Company's landlords and an equipment lessor. In addition, Wells Fargo also holds a $225,000 deposit in this account as a reserve to secure the Company's corporate credit card program (the "Credit Card Program") [2]. On April 30, 2014, Wells Fargo notified the Company that it was reducing the credit limit on the Credit Card Program to $100,000 and gave a 30-day notice that it would be canceling the program, effective June 1, 2014. The Debtors have requested Wells Fargo to advance credit pursuant to the terms of the Credit Card Program and anticipate negotiating with Wells Fargo to extend that period.

26. Other accounts include a holding account at East West Bank, a recently opened operating account at Wells Fargo which has not yet been funded, special purpose accounts used to

---

[2] The corporate credit cards are primarily used by the Company's service engineers to obtain parts or other supplies to service the Company's customers. Continued and uninterrupted use of the Credit Card Program is necessary to timely perform these services.

RAF:sb
H:\Client Matters\- F&R\ClearEdge\Pl\CE Inc\1st Day\Omnb\Dec v4.docx

7

OMNIBUS DECLARATION OF DAVID B. WRIGHT
IN SUPPORT OF FIRST DAY MOTIONS

Case: 14-51955   Doc# 24   Filed: 05/06/14   Entered: 05/06/14 17:15:54   Page 7 of 12

pay permit fees or other related installation costs, a money market account held at Wells Fargo and four (4) accounts held by CEPIS in South Korea (the "South Korea Accounts") to receive customer payments and to pay employees and other business operations in South Korea. (collectively, the "Other Accounts"). All of the Bank Accounts are identified on Exhibit "A".

27. The Bank Accounts and the Cash Management System are well-suited to the Debtors' business needs and operations. Indeed, it is vital to the Company's operations that its customers continue to remit payments to the appropriate deposit accounts without disruption caused by the closing of these accounts. To require the Debtors to close the Bank Accounts and reestablish new accounts would require considerable time and expense to the Debtors' estates, particularly considering that its customers have been directed to deposit remittances in the Lender Restricted Bank Accounts and the Mellon Account. Similarly, continued use of the Master and Oregon Operating Accounts and the Wells Fargo LC Bank Account, including the Credit Card Program, are vital to the Debtors' operations. Permitting the Debtors to continue using their existing Bank Accounts is essential to a smooth and orderly transition of the Debtors into chapter 11 and to avoid disruption of their business and operations.

28. For similar reasons, the Debtors should be authorized to continue to fund their business and operations by payments and disbursements made from the Bank Accounts and should be exempt from certain of the Guidelines established by the Office of the United States Trustee for Region 17. Maintenance of the Lender Restricted Bank Accounts, the Mellon Account, the Master Operating Account, the Oregon Operating Account, the Wells Fargo LC Bank Account and the South Korea Accounts are especially essential to the Debtors' operations. Closing these accounts may lead to defaults in applicable loan documents and will cause confusion and disruption to customers in remitting payments, receipt of which is vital to the Debtor's operations and will hinder continued production and vital services provided by the Company to its customers. It is thus critical, both to the continuity of the Debtors' business operations and to the preservation of the value of the business, that the Debtors be allowed to continue to utilize their existing Cash Management System without disruption. Disrupting these cash management procedures and closing the Bank Accounts would severely impair the Debtors' ability to preserve and enhance their value and to successfully

reorganize during these Chapter 11 Cases. Accordingly, the Debtors respectfully submit that allowing the Debtors' continued use of the Bank Accounts will preserve business continuity and is in the best interests of employees, creditors, vendors and customers.

### F. The Employee Benefits Motion

29. As of the Petition Date, the Debtors employ 72 Employees, located in Connecticut, California, Oregon and South Korea. Employees include service engineers, installation engineers, sales and operational employees.

30. The Debtors' workforce is critical to its business operations. Each of the Employees is essential not only to the continued, uninterrupted operation of the Debtors' business, but to effectuating the orderly administration of the Debtors' bankruptcy cases and a successful plan of reorganization.

31. On April 30, 2014, the Debtors paid their employees salary and expense reimbursements for the period covering though April 30, 2014. The Debtors distribute payroll to all employees through direct deposit. Thus, the Debtors believe that all Pre-petition Wages owing on April 30, 2014, have been paid. To the extent any Employees are still owed wages for any amounts earned within 180 days of the Petition Date, the Debtors request authority to pay such Pre-petition Wages up to the amount of $12,475.

32. In connection with the employee wages, the Debtors also pay certain employment taxes and fees in the ordinary course of business. To the extent that such payments will be required, the Debtors seek authority to pay the prepetition employer-portion of the employment tax to the appropriate taxing authorities in the ordinary course of business through their payroll processing service.

33. In the ordinary course, the Debtors provide PTO to their employees. The Debtors request authority to continue to honor PTO earned pre-petition by the Employees and allow such Employees to use pre-petition accrued PTO in the ordinary course of business up to the maximum limit provided by § 507(b)(4).

34. In addition, the Debtors customarily reimburse their employees for business expenses incurred in performing their duties such as travel, meals, mileage, and telephone use. While the

Debtors are not aware of any such outstanding claims by Employees as of the Petition Date, there may be outstanding pre-petition Employee expense reimbursement claims that have not been paid and the Debtors acknowledge that there may be Employees that may not have submitted all claims timely. The Debtors seek authority to pay such pre-petition business expenses in the ordinary course and to honor outstanding checks related thereto, if any, up to the maximum limit provided by § 507(b)(4).

35. Furthermore, the Debtors customarily pay their employees' medical, vision, dental, disability and life insurance premiums (subject to various employee contributions). Debtors seek authority to pay a $30,000 invoice to LifeMap for April 2014 for short-term and long-term disability and Accidental Death and Dismemberment insurance. The Debtors believe that they are current with respect to any other employee related insurance policies, but in the event that there are some premiums that were due and outstanding prior to the Petition Date, the Debtors request authority to make payments for pre-petition health and welfare premiums up to the limits provided by § 507(a)(5).

36. In the ordinary course of their business, for those employees who so elect, the Debtors deduct amounts from wages for contribution to the Company's Medical / Dependent Care Flex Spending ("Flex") claims and administrative fees, and Health Savings Accounts ("HSA" and collectively with Flex, the "Flex/HSA Program"). Historically, the Flex claims have been processed and paid by Allegiance Benefit Plan Management, Inc. ("Allegiance") which is then reimbursed by the Debtors. Allegiance has recently informed the Debtors that it will require a deposit to continue to process claims. The Debtors are currently negotiating the amount of that deposit. To the best of the Debtors' knowledge, all claims pending as of the Petition Date have been paid. The Debtors request authority to pay recurring deposits and administrative fees to Allegiance and/or the third party administrator for HSA claims to allow processing of pre-petition and post-petition claims under these plans.

37. The Flex/HSA Program will be cancelled effective as of May 1, 2014. The Debtors request, to the extent they are legally able to do so, permission to refund unspent contributions to the Employees, up to the maximum limit provided by § 507(b)(4). In addition, there are approximately

RAF:sb
H:\Client Matters\- F&R\ClearEdge\Pl\CE Inc\1st Day\Omnb\Dec v4.docx

10

OMNIBUS DECLARATION OF DAVID B. WRIGHT
IN SUPPORT OF FIRST DAY MOTIONS

Case: 14-51955    Doc# 24    Filed: 05/06/14    Entered: 05/06/14 17:15:54    Page 10 of 12

five (5) employees who were terminated prior to the Petition Date from whom deductions to the program were withdrawn, but who were never enrolled in the Flex/HSA Program. These amounts belong to these employees and are not property of the estates. In an abundance of caution, the Debtors request authorization to refund these amounts.

### G. The Utilities Motion

38. In the ordinary course of business, the Debtors obtain water, sewer, gas, heat, electricity, telephone, internet, and similar utility products and services (collectively, the "Utility Services") from various Utility Providers, including without limitation those listed on Exhibit 1 attached to the Utilities Motion (the "Utility Service List"). The Utility Service List lists the amount of arrearages due and owing by the Debtors with respect to the undisputed invoices of each of the Utility Services as of the Petition Date. Over the past 11 months, the Debtors paid an average of approximately $230,000 per month on account of the Utility Services.

39. Preserving Utility Services on an uninterrupted basis is essential to the Debtors' ongoing operations, and, therefore, to the success of their reorganization. Indeed, any disruption of the Utility Services, even for a brief period of time, would disrupt the Debtors' ability to operate and maintain their business as a going concern and would thereby negatively impact the Debtors' customer relationships, potential future revenues and profits. Such a result could seriously jeopardize the Debtors' reorganization efforts, and ultimately, the Debtors' value and creditors' recoveries. It is therefore critical that Utility Services continue uninterrupted during these Chapter 11 cases.

40. In order to provide adequate assurance of payment for future services to its Utility Providers, the Debtors propose to make a deposit of approximately $150,000.00, which represents an amount equal to the estimated aggregate cost for two weeks of utility services calculated as an historical average over the past 11 months, factored for current operating conditions (the "Adequate Assurance Deposit") into a segregated, interest-bearing account for the benefit of Utility Providers on or before the date that is 20 days after the Petition Date. The Adequate Assurance Deposit attributable to each Utility Provider shall be maintained until the earlier of: (i) the Debtors' termination of Utility Services from such Utility Provider or (ii) the conclusion of these

Chapter 11 Cases, if not applied earlier.

41. The Debtors have also proposed that the Court approve and adopt the Adequate Assurance Procedures as identified and explained in the Utilities Motion.

I declare under penalty of perjury under the laws of the State of California and of the United States that the foregoing is true and correct and that this Declaration was executed on May 6, 2014.

*/s/ David B. Wright*
David B. Wright

RAF:sb
H:\Client Matters\- F&R\ClearEdge\Pl\CE Inc\1st Day\Omnb\Dec v4.docx

12

OMNIBUS DECLARATION OF DAVID B. WRIGHT
IN SUPPORT OF FIRST DAY MOTIONS

Case: 14-51955    Doc# 24    Filed: 05/06/14    Entered: 05/06/14 17:15:54    Page 12 of 12