JOHN WALSHE MURRAY (074823)
STEPHEN T. O'NEILL (115132)
ROBERT A. FRANKLIN (091653)
THOMAS T. HWANG (218678)
DORSEY & WHITNEY LLP
305 Lytton Avenue
Palo Alto, CA 94301
Telephone: (650) 857-1717
Facsimile: (650) 857-1288
Email: murray.john@dorsey.com
Email: oneill.stephen@dorsey.com
Email: franklin.robert@dorsey.com
Email: hwang.thomas@dorsey.com

Attorneys for Debtors

# UNITED STATES BANKRUPTCY COURT

## NORTHERN DISTRICT OF CALIFORNIA

### SAN JOSE DIVISION

| | |
|---|---|
| In re: | ) |
| | ) |
| **CLEAREDGE POWER, INC.,** | ) Case No. 14-51955-CN-11 |
| Employer Tax I.D. No. 20-0119415 | ) |
| | ) |
| **CLEAREDGE POWER, LLC** | ) Case No. 14-51956-CN-11 |
| Employer Tax I.D. No. 06-1517615 | ) |
| | ) |
| **CLEAREDGE POWER** | ) Case No. 14-51960-CN-11 |
| **INTERNATIONAL SERVICE, LLC** | ) |
| Employer Tax I.D. No. 27-3468551 | ) |
| | ) Cases Jointly Administered |
| Debtor(s). | ) Under Chapter 11 |
| | ) |
| 920 Thompson Place, Suite 100 | ) Date: June 5, 2014 |
| Sunnyvale, California 94085 | ) Time: 11:00 a.m. |
| | ) Place: 280 S. First Street, Room 3070 |
| | ) San Jose, CA 95113 |
| | ) Judge: Honorable Charles Novack |

### AMENDED MOTION TO APPROVE BID PROCEDURES AND RELATED MATTERS RE SALE OF CERTAIN ASSETS OF THE DEBTORS

# **TABLE OF CONTENTS**

I.    Summary Of Sale And Relief Sought ............................................................... 1

II.   Background Summary ....................................................................................... 3

III.  The Amended Motion ....................................................................................... 6

    A.   Bid Procedures. ...................................................................................... 6

    B.   Break-Up Fee. ......................................................................................... 7

    C.   Scheduling of Sale Hearing. ................................................................... 7

    D.   Provisions for Notice and Objection Dates. ........................................... 8

IV.   Discussion ......................................................................................................... 12

    A.   Applicable Law. ...................................................................................... 12

    B.   The Proposed Bid Procedures, Including The Break Up Fee, Are Fair, Reasonable And In The Best Interests Of Debtors' Estates. ................................................ 13

# TABLE OF AUTHORITIES

Page(s)

## Cases

*In re 995 Fifth Ave. Assocs., L.P.*,
  96 B.R. 24 (Bankr. S.D.N.Y. 1989).................................................................13

*In re America West Airlines, Inc.*,
  166 B.R. 908 (Bankr. D. Ariz. 1994)..............................................................13

*In re APP Plus, Inc.*,
  223 B.R. 870 (Bankr. E.D.N.Y. 1998)............................................................13

*In re Bethlehem Steel Corp.*,
  2003 U.S. Dist. LEXIS 12909 (S.D.N.Y. July 28, 2003) ...............................13

*In re Blue Coal Corp.*,
  168 B.R. 553 (Bankr. M.D. Pa. 1994) ............................................................12

*Calpine Corp. v. O'Brien Envtl. Energy, Inc. (In re O'Brien Envtl. Energy, Inc.)*,
  181 F.3d 527 (3d Cir. 1999).....................................................................13, 14

*Four B. Corp. v. Food Barn Stores, Inc. (In re Food Barn Stores, Inc.)*,
  107 F.3d 558 (8th Cir. 1997) ..........................................................................12

*In re Fruehauf Trailer Corp.*,
  Case No. 96-LS63 (PJW) (Bankr. D. Del. Feb. 26, 1997)..............................12

*In re Hupp Indus., Inc.*,
  140 B.R. 191 (Bankr. N.D. Ohio 1992) ..........................................................13

*In re Montgomery Ward Holding Corp.*,
  Case No. 97-1409 (PJW) (Bankr. D. Del. Aug 6, 1997) .................................12

*Official Committee of Subordinated Bondholders v. Integrated Resources, Inc. (In re Integrated Resources, Inc.)*,
  147 B.R. 650 (Bankr. S.D.N.Y. 1992), *app. dismissed on jurisdictional grounds* 3 F.3d 49 (2d Cir. 1993)...........................................................................12, 13

*Otto Preminger Films, Ltd. v. Qintex Entertainment, Inc. (In re Qintex Entertainment, Inc.)*,
  950 F.2d 1492 (9th Cir. 1991) ........................................................................11

## Statutes

11 U.S.C. § 363...............................................................................................1, 13

11 U.S.C. § 363(b)...............................................................................................11

Case: 14-51955    Doc# 61    Filed: 05/20/14    Entered: 05/20/14 15:45:41    Page 3 of 22

11 U.S.C. §§ 503(b) and 507(a)(2) ...............................................................................7, 15

11 U.S.C. §§ 1107 and 1108 ...........................................................................................2

**Other Authorities**

B.L.R. 2002-1(c) ..........................................................................................................8, 16

B.L.R 6004(f)(1) ..............................................................................................................12

B.L.R 2002 .........................................................................................................................8

Fed. R. Bankr. P. 2002 and 6004 ......................................................................................1

Fed. R. Bankr. P. 6004 ....................................................................................................11

Fed. R. Bankr. P. 6004(f)(1) ...........................................................................................12

Fed. R. Bankr. P. 9014 ....................................................................................................10

ClearEdge Power, Inc. ("CEP"), ClearEdge Power LLC ("CEP LLC") and ClearEdge Power International Services LLC ("CEPIS" and collectively with CEP and CEP LLC, the "Debtors" or "Company"), the debtors and debtors in possession in these jointly administered cases, hereby file this motion for entry of an order approving certain sale procedures in connection with the proposed sale of substantially all of the Debtors' assets

This motion (the "Amended Motion")[1] is made pursuant to 11 U.S.C. § 363 and Rules 2002 and 6004 of the Federal Rules of Bankruptcy Procedure (the "Bankruptcy Rules"). This Amended Motion is supported by the DECLARATION OF DAVID B. WRIGHT IN SUPPORT OF FIRST DAY MOTIONS [Docket No. 24] (the "Omnibus Declaration"), the DECLARATION OF GLORIA FAN IN SUPPORT OF MOTION FOR ORDER APPROVING BID PROCEDURES AND RELATED MATTERS RE SALE OF CERTAIN ASSETS OF THE DEBTORS [Docket 53-2] (the "Fan Declaration"), and the DECLARATION OF THOMAS T. HWANG IN SUPPORT OF MOTION FOR ORDER APPROVING BID PROCEDURES AND RELATED MATTERS RE SALE OF CERTAIN ASSETS OF THE DEBTORS [Docket 53-3] (the "Hwang Declaration"), and will be based on such other evidence and argument as may be presented at the hearing on the Motion.

## I. SUMMARY OF SALE AND RELIEF SOUGHT

1. The Debtors have retained TGI Financial, Inc. dba Gerbsman Partners ("Gerbsman Partners") to prepare a solicitation package describing the purchase and sale opportunity and present a proposed asset purchase agreement (the "Solicitation Package") and to solicit interest for and complete an acquisition of all or substantially all of the Company's assets (collectively, the "Assets"), including, but not limited to, its intellectual property, in whole or in part, as will be identified in the Solicitation Package. The solicitation process is now ongoing, and prospective bidders are scheduling due diligence visits.

---

[1] The Amended Motion amends the Debtors' MOTION FOR ORDER APPROVING BID PROCEDURES AND RELATED MATTERS RE SALE OF CERTAIN ASSETS OF THE DEBTORS filed on May 15, 2014 [Docket No. 53] (the "Original Motion"). The amendments thereto are indicated on Exhibit "A" to the DECLARATION OF THOMAS T. HWANG RE AMENDMENTS TO MOTION TO APPROVE BID PROCEDURES AND RELATED MATTERS RE SALE OF CERTAIN ASSETS OF THE DEBTORS filed concurrently herewith. As set forth therein, the amendments in the Amended Motion include extending the deadlines with respect to the filing and service of the sale-related pleadings such that the Sale Hearing (defined below) and the pleadings related thereto shall be on a regular schedule in accordance with Local Bankruptcy Rule 9014-1(c)(1). Accordingly, the Debtors are not requesting that the Court shorten time with respect to the Sale Motion and the Assumption Motion (as defined below).

2.     By this Motion, the Debtors request an order approving certain bid procedures which are set forth on **Exhibit "A"** hereto and incorporated herein by reference (the "Bid Procedures")[2], which set forth the terms and conditions of the competitive bidding and auction process by which the Debtors intend to sell their Assets.  The Debtors also request an order (a) establishing June 25, 2014 at 4:00 p.m. PDT (the "Bid Deadline") as the last day on which prospective buyers can submit bids for the Assets[3], and (b) authorizing the Debtors to conduct an auction (the "Auction") at the Sale Hearing (as defined below) on the terms and conditions of the Bid Procedures, and at which the Debtors may accept one or more offers to purchase the Assets (the "Sale").

3.     By this Motion, the Debtors further request that the Court specially set the hearing (the "Sale Hearing") on their motion to approve the Sale (the "Sale Motion") of the Debtors' Assets (the "Purchased Assets").  In connection with the Sale, the Debtors also request that the Court specially set for the same date and time, the hearing on their motion to approve the assumption and assignment of executory contracts and leases (to which any of the Debtors is a party) to be included in the transaction (the "Assumption Motion").  Finally, the Debtors request that the Sale Hearing be scheduled for July 7, 2014[4], or as soon as possible thereafter as the Court's calendar permits.

4.     As discussed below, the Debtors believe that the Sale pursuant to the Bid Procedures will allow the Debtors to maximize the value of the Purchased Assets.  The Debtors further believe that the scheduling of the Bid Deadline on or before June 25, 2014 and the Sale Hearing on July 7, 2014, will provide sufficient opportunity for interested parties to submit a competing bid and participate in the Auction.  The Debtors believe that a sale process as described herein will maximize the value of the Purchased Assets and is in the best long-term interests of the Debtors' customers, vendors and employees.

---

[2] The Bid Procedures have been amended from the version attached to the Original Motion.  All changes are indicated on Exhibit "A" to the DECLARATION OF THOMAS T. HWANG RE AMENDMENTS TO MOTION TO APPROVE BID PROCEDURES AND RELATED MATTERS RE SALE OF CERTAIN ASSETS OF THE DEBTORS filed concurrently herewith.

[3] As set forth in the Bid Procedures, interested bidders who submit bids by the Bid Deadline which do not meet all of the requirements to be a Qualified Bid (as defined in the Bid Procedures) will have until June 30, 2014, to cure any deficiencies in their bids in order to become a Qualified Bid.

[4] Counsel for the Debtors has advised the Court's calendar clerk that they are seeking a hearing date as early as possible during the week of July 7, 2014.

## II. BACKGROUND SUMMARY[5]

5.     The Debtors commenced these Chapter 11 cases with the filing of their respective Voluntary Petitions on May 1, 2014 (the "Petition Date"), and are presently operating their businesses as debtors in possession pursuant to the provisions of Bankruptcy Code § 1107 and 1108.

6.     No official committee of unsecured creditors has been formed in the bankruptcy cases to date.

7.     Founded initially in 2003 as Quantum Leap Technology before changing its name to ClearEdge Power in 2005, the Company designs, manufactures, sells and services combined heat and power distributed generation fuel cell systems for commercial, industrial, utility and residential applications.  The Company's fuel cell systems integrate proprietary components and utilize an innovative, moderate-temperature phosphoric acid fuel cell ("PAFC") technology to cleanly convert natural gas to electricity and heat at the point of use, through an ultra-clean electrochemical process. The systems can operate during a utility grid outage and can also be configured to operate completely independent of the grid, therefore providing a highly reliable and clean source of electricity and heat to a customer's facility.  The generated electricity provides electric power that is both economically competitive and more reliable than electricity from the grid, while the generated heat is used by customers to further reduce operating expenses.  The Company's systems deliver a lower lifetime cost of energy than current grid prices and include a highly efficient fuel cell stack with a proven, industry-leading 10-year cell stack life that reduces service costs with extended operational life.

8.     The Company's fuel cell systems therefore feature three key elements: (a) reduced utility expenses with an attractive economic payback, (b) improved corporate sustainability through reduced greenhouse gas emissions, and (c) highly reliable backup power capability to keep critical operations running.

9.     After substantial declines in sales during fiscal years 2008 and 2009, annual sales have stabilized over the past two fiscal years in the $115 million to $120 million range with gross margins in the range of 38% to 42%.  The management team has also significantly reduced

---

[5] This factual summary is supported by the Omnibus Declaration filed in support of the Debtors' first day motions.

expenses, most notably corporate overhead, and closed its Palo Alto location that operated at a loss.

10.     In early 2013, CEP acquired UTC Power, Inc. ("UTC Power"), formerly a subsidiary of United Technologies Corporation, largely to leverage UTC Power's advanced, large-scale PAFC technology which UTC Power had developed over a 50 year period.  In addition to leveraging over five decades of expertise in the fuel cell industry, the Company's strategic decision to acquire UTC Power resulted in the Company's ownership of the industry's largest portfolio of intellectual property.

11.     Since its inception, the Company has grown to one of the leading fuel cell companies in the industry, having established long-standing relationships with a broad and diverse range of customers across a variety of industries and geographies, in addition to partners and distributors globally.  The Company's commercial and industrial sector customers include: Verizon, Samsung, CBS, First National Bank, Whole Foods Market, Coca-Cola, University of Connecticut, Saint Francis Hospital, Adventist Health, and Roche Pharmaceuticals.  The Company also has several important utility sector customers which include: San Diego Gas & Electric and New York Power Authority in the U.S., and, GS Power, SK E&S, and Korea Southeast Power in South Korea.

12.     Based in Sunnyvale, California, CEP operates as the Company's headquarter office. CEP LLC maintains an engineering facility in Hillsboro, Oregon and a major manufacturing and engineering hub in South Windsor, Connecticut, along with satellite offices in Southern California. CEPIS, which is based in Connecticut, manages the Company's international business, specifically its business in South Korea.  CEPIS is a wholly-owned subsidiary of CEP LLC, and CEP LLC is a wholly-owned subsidiary of CEP.

13.     In connection with the acquisition of UTC Power, the Company effected a reorganization whereby the majority of its debts, liabilities and assets, including the acquired liabilities and assets of UTC Power, were consolidated into CEP LLC as the operating company.  As a result, the majority of the Company's assets and obligations are held by CEP LLC with the majority of the balance shared among the three Debtor entities.  Historically, the Company has prepared consolidated financial statements for its affiliated companies.

14.     The Debtors' consolidated balance sheet for the fiscal quarter ending March 31, 2014

1  lists assets of $189,371,952, liabilities of $129,339,076 and stockholder's equity of $60,031,876.  In

2  fiscal 2013, the Debtors had revenues of $69,287,000.

3        15.     The Company has historically experienced strong growth and has been the leader in

4  the field of stationary fuel cell systems.  However, instability within the industry, together with

5  constraints on working capital, has resulted in the Company's financial distress.  In recent months,

6  the Company has been unsuccessful in obtaining additional financing to continue operations as a

7  going concern.  As the Company's available cash has waned, it has been unable to satisfy its

8  payables.  In order to streamline operations, among other things, the Company laid off the majority

9  of its workforce prior to the Petition Date.

10       16.     After considering numerous options over several weeks, the Company's board of

11  directors decided that it is in the best interests of the Company's creditors and equity holders to

12  consummate some form of sale, merger, acquisition and/or related transaction.  Unable to meet its

13  growing debt obligations, the Company made a strategic decision to file for bankruptcy to provide

14  the Company time to restructure its finances and operations, market its assets, negotiate sale terms,

15  and conduct an auction of its assets to the highest bidder, under the auspices and protection of the

16  Bankruptcy Court.

17       17.     Subject to the Court's approval, the Debtors have retained Gerbsman Partners,

18  effective May 1, 2014, as their investment banker and financial advisor to assist the Company in the

19  evaluation of restructuring alternatives, in maximizing the Company's enterprise value, in

20  canvassing the marketplace for potential investors or buyers, and in managing the Debtors' efforts to

21  market and sell the Assets.  Gerbsman Partners has prepared a confidential information

22  memorandum detailing the Company and its history, the Assets and the investment or acquisition

23  opportunity which will be included in the Solicitation Package.[6]  Gerbsman Partners will provide the

24  Solicitation Package, and other information related to the proposed Sale and Bid Procedures, to

25  prospective bidders upon after execution of an appropriate confidentiality agreement.

26       18.     The Debtors believe that an expedited sale process is necessary to realize the highest

27  _____
     [6] Additional details of the Debtors' pre-petition and post-petition marketing efforts will be provided in

28  connection with the Sale Motion.  The Debtors will supplement the record as may be required by the Court at the hearing
    on this Motion and at the Sale Hearing.

value for the Purchased Assets and that the Sale is in the best long-term interest of the Debtors' customers, vendors and employees. While the reduction in force and streamlining of operations have reduced expenditures, the Debtors nevertheless need to continue to conduct operations to preserve the going concern value of the Company. However, the Company does not have sufficient cash to operate for an indefinite period. The expedited sale process strikes a balance between providing the Debtors time to market their assets and yet continue to conduct operations. Accordingly, the Debtors request a special setting of the Sale Hearing in order that the Debtors can provide notice of the hearing on the Sale Motion.

19.    The Debtors believe the Sale is in the best interest of creditors. The anticipated assumption and assignment of many of the Debtors' unexpired leases and executory contracts in connection with the Sale will reduce overall claims against the Debtors. The Debtors believe that the Sale pursuant to the Bid Procedures will allow the Debtors to maximize the value of the Purchased Assets for the benefit of creditors.

## III.    THE AMENDED MOTION

### A.    **Bid Procedures.**[7]

20.    The Debtors and their advisors have developed the Bid Procedures to govern the process of solicitation of bids, the selection of a "Stalking Horse" and the Auction at which overbids may be submitted, and a sale (or sales) may be approved and closed. As set forth more fully in the Bid Procedures in **Exhibit "A"** hereto, all Qualified Bidders (as defined therein) shall submit their bids at or before the Bid Deadline. Bids shall accompanied by an executed Purchase Agreement and a deposit of $250,000 and shall also include evidence of financial ability to cure defaults and perform the obligations under any contract to be assumed as part of the bid. Immediately after the Bid Deadline, the Debtors will determine the highest and best bid for substantially all of the Assets and may, but are not required to, designate that bidder as the "Stalking Horse Bidder" and execute a Purchase Agreement subject to higher and better bids at the Auction and to final approval by the Court. The Auction will be conducted in accordance with the Bid Procedures. In the instance the

---

[7] This section summarizes the basic provisions of the Bid Procedures. The Bid Procedures are set forth more fully in **Exhibit "A"** hereto.

Debtors designate a Stalking Horse Bidder, any initial overbid must be, at a minimum, equal to the sum of (a) the Purchase Price of the Stalking Horse Bid (as shall be defined in the Purchase Agreement with the Stalking Horse, if any); (b) $250,000 representing the Break-Up Fee (as defined below); and (c) $500,000.00. Subsequent overbids must be no less than the greater of (a) 5% of the Purchase Price (or, in the instance no Stalking Horse Bid is designated, 5% of the Purchase Price of the best and highest bid(s) as determined and announced by the Debtors prior to the Auction pursuant to the Bid Procedures, and (b) $250,000.

21. The Debtors in their sole discretion shall determine the highest and best bid(s) for some or all of the Assets and will submit the corresponding Purchase Agreement(s), together with any Assumption Motion, for approval by the Court pursuant to the Sale Motion at the Sale Hearing. The Debtors submit that the proposed Bid Procedures are reasonable and necessary under the circumstances and will facilitate the consummation of an orderly sale and maximize the value of the Purchased Assets for the Debtors' Chapter 11 estates.

**B.       Break-Up Fee**.

22. The Bid Procedures entitle the Stalking Horse Bidder designated by the Debtors, if any[8], to a fee of $250,000.00 (the "Break-Up Fee") in the event the Purchased Assets are sold to another bidder, provided that the Stalking Horse Bidder will not be entitled to the Break-Up Fee in the event it submits an overbid. As discussed in greater detail below, the Debtors believe that the Break-Up Fee is reasonable and in the best interests of their estates.

23. In the event the Stalking Horse Bidder is entitled to the Break-Up Fee, the Debtors propose that such obligation will have priority as an administrative expense under sections 503(b) and 507(a)(2) of the Bankruptcy Code and will be paid from the proceeds received from the Sale, as soon as possible following the closing of the Sale, free and clear of the liens, claims and encumbrances of any other secured creditors on such proceeds.

**C.       Scheduling of Sale Hearing.**

24. In furtherance of the Sale, the Debtors request that the Sale Hearing (to include both the Sale Motion and the Assumption Motion) be scheduled by the Court on July 7, 2014, or as soon

_____

[8] The Debtors are not required to designate a Stalking Horse Bidder.

as possible thereafter as the Court's calendar permits. As discussed above, the Company does not have sufficient available cash to continue business operations for an indefinite period of time. Thus, the Company's financial situation requires that the Sale close as soon as possible. Based on Gerbsman Partners' extensive marketing of the opportunity both prior to and since the Petition Date, the Debtors do not believe that additional time will yield any additional bids; however, the Bid Procedures provide the Debtors with the right to qualify any bids up to the time of the Auction.

25. The Debtors anticipate that there may be parties to executory contracts and unexpired leases who might be impacted by the request for a specially set hearing on the Assumption Motion.[9] If any particular issues arise regarding adequate protection or disputes over cure amounts (which are not anticipated), the Debtors are confident that such issues can be addressed in a timely fashion such that that the Sale may close as contemplated.

26. In connection with the Sale, the Debtors request that the Court establish the dates and manner of service for various notices. The Debtors also request that the Court establish certain objection deadlines including the date by which persons must object to the Debtors' proposed cure amounts in connection with the proposed assumption and assignment of executory contracts and unexpired leases.

**D. Provisions for Notice and Objection Dates.**

27. **Notices**. The Debtors request authority to utilize the service lists maintained by their bankruptcy counsel for all mailings pertaining to the Sale. As set forth in the Hwang Declaration, Dorsey regularly updates its mailing lists based on return mailings, requests for special notice, proofs of claim filed in the case, among other updates. B.L.R. 2002-1(c) requires use of a "current mailing list." The Debtors submit that use of Dorsey's most current service lists for all sale related notices satisfies this requirement. In addition to Insolvency Services Group, Inc. ("ISG"), the Court-appointed noticing and claims agent in these cases, the Debtors also request authority to utilize such outside contractors as they may deem appropriate to handle the duplication of sale-related notices

---

[9] The Debtors intend to provide notice to all non-debtor parties to executory contracts and unexpired leases (the "Contract Counterparties") to which any of CEP, CEP LLC and CEPIS is a party, of the possibility that their executory contract or unexpired lease may be assumed and assigned, in that bidders may require different executory contracts and unexpired leases in their bids.

and other pleadings, and to handle the actual mailing to the persons as established by the Court's order on this Motion, utilizing the service lists maintained by Debtors' counsel. The Debtors, through ISG or other outside contractors as appropriate, propose to provide notice of hearing on sale-related matters as provided below.

        a.    **Bid Procedures and Sale Motion**.

        (i)    Following entry of the Court's order on this Motion (the "<u>Bid Procedures Order</u>") and not less than twenty-eight (28) days prior to the Sale Hearing, the Debtors propose to serve notice of the Sale Hearing (the "<u>Sale Notice</u>") and a copy of the Bid Procedures Order (with the approved Bid Procedures), by first-class mail, postage-prepaid, to: (i) any creditors' committee appointed in the case and its counsel; (ii) all entities that claim any lien on the Debtors' assets; (iii) all Contract Counterparties to executory contracts and unexpired leases which the Debtors may seek to assume and assign to the Successful Bidder (as defined in the Bid Procedures); (iv) all governmental taxing authorities that have, or as a result of the sale of any of the Debtors' assets may have, claims, contingent or otherwise, against the Debtors; (v) all parties that have filed requests for notices or have appeared under Bankruptcy Rules 2002 and/or 9010(b); (vi) all interested governmental, environmental and pension entities; (vii) the Office of the United States Trustee; (viii) to the extent practicable, all entities which have expressed to the Debtors or Gerbsman Partners an interest in purchasing any of the Assets, within the 12 months prior to the Petition Date; and (ix) all creditors listed on the Debtors' Schedule D filed in the bankruptcy cases (the "<u>Notice Mailing List</u>").

        (ii)    Not later than twenty-eight (28) days prior to the Sale Hearing, in addition to the Notice Mailing List, the Debtors shall cause the Sale Notice to be sent by first-class mail, postage-prepaid, to all persons listed on the Debtors' creditor matrix and all persons who have filed proofs of claim in these cases.

        b.    **Assumption Motion**. In connection with the Sale Motion, the Debtors will file a motion to assume and assign executory contracts and unexpired leases (collectively, the "<u>Assumed Contracts</u>") to the Successful Bidder at the Sale Hearing, pursuant to the Purchase Agreement with such bidder. The notice of hearing on such motion (the "<u>Assumption Notice</u>") will

provide the Debtors' intention to assume and assign the Assumed Contracts of the non-debtor parties and will include a schedule setting forth the amounts any and all defaults thereunder, as determined by the Debtors (the "Cure Amounts"). The Debtors propose to serve the Assumption Notice by first class mail, postage prepaid, on the persons on the Notice Mailing List not less than twenty-eight (28) days prior to the Sale Hearing.

28.     **Moving Papers**

a.          **Bid Procedures, Sale Motion and Assumption Motion**.  Following the approval of this Motion, the Debtors shall cause, not less than twenty-eight (28) days before the Sale Hearing, service of the Sale Motion (which shall include as an exhibit, either (i) the form of Purchase Agreement prepared and provided by the Debtors to interested bidders, or (ii) the Purchase Agreement with any designated Stalking Horse Bidder (excluding any confidential exhibits or schedules) in the event that the Debtors have so designated the Stalking Horse Bidder at that time, the Assumption Motion, and all declarations in support thereof, by first-class mail, postage prepaid, on: (i) the Office of the United States Trustee for the Northern District of California, San Jose Division; (ii) any creditors' committee and its counsel; (iii) all entities (or counsel therefor) known to have asserted any lien, claim, encumbrance, right of refusal, or other property interest in or upon the Debtors or the Assets; (iv) all parties that have expressed a bona fide interest in acquiring the Assets or that the Debtors believe may be interested in proposing a bid for the Assets of the Company; (v) the Internal Revenue Service and all applicable state and local taxing authorities; (vi) all entities who have filed a notice of appearance and request for service of papers in these cases; and (vii) all Contract Counterparties (collectively, the "Motion Service List").

b.          **Designation Re Stalking Horse**.[10]  Not less than five (5) days[11] prior to the Sale Hearing, the Debtors shall file with the Court a supplemental document (the "Designation Re Stalking Horse") identifying, in the instance the Debtors have not previously identified a Stalking

---

[10] In addition to the matters set forth herein, the Designation re Stalking Horse will include, or will be filed concurrent with, one or more declarations updating, among other things, the Debtors' sale efforts and alternatives, in addition to and to the extent reasonably ascertainable, anticipated administrative expenses related to and proceeds of the proposed Sale, if any, relationships to the proposed purchaser, if any, and compensation received by insiders pending approval of the proposed Sale, if any.

[11] Notwithstanding this five (5) day deadline, the Debtors will file the Designation re Stalking Horse as soon possible at such time they designate a Stalking Horse Bid, if at all.

Horse Bid by that time in the Sale Motion, which bid, if any, is designated as the Stalking Horse Bid[12] or, in the alternative, stating that the Debtors have not designated any bid as the Stalking Horse Bid.[13] The Debtors shall cause, not less than five (5) days prior to the Sale Hearing service of the Designation Re Stalking Horse on the persons on the Motion Service List (i) via the Court's ECF system to those persons registered to receive notice via such system and (ii) via email or facsimile, where available to the Debtors, or via overnight mail to those persons not registered to receive notice via the Court's ECF system.

29. **Objection Bar Dates**.

a. **To Asset Sale**. The Debtors request, pursuant to Fed. R. Bankr. P. 9014, that objections, if any, to the Sale, must: (i) be in writing; (ii) comply with the Federal Rules of Bankruptcy Procedure and the Local Bankruptcy Rules; (iii) be filed with the Clerk of the Bankruptcy Court for the Northern District of California, San Jose Division, on or before seven (7) days prior to the Sale Hearing, and (d) be served no later than fourteen (14) days prior to the Sale Hearing on: (i) Debtors' counsel, John Walshe Murray of Dorsey & Whitney LLP, 305 Lytton Ave., CA 94301, facsimile (650) 644-0274, email: murray.john@dorsey.com; (ii) the Office of the United States Trustee, Attn: John Wesolowski, 280 South First Street, Room 268, San Jose, CA 95113, facsimile (408) 535-5532; email: john.wesolowski@usdoj.gov; and (iii) counsel for any creditors' committee appointed in the case (the foregoing are collectively referred to as the "Service Parties").

b. **To Assumption and Cure Amounts**. The Debtors further request that the Contract Counterparties have until fourteen (14) days prior to the Sale Hearing (the "Cure Bar Date") (i) to object to the assumption and assignment of any of any Assumed Contracts, or (ii) object to the amount of the Cure Amounts, or (iii) to assert that non-monetary defaults, conditions or pecuniary losses or other amounts must be cured or satisfied (including all compensation for any pecuniary loss resulting from a default in respect of the Assumed Contracts) under any of the

---

[12] Pursuant to the Bid Procedures, the Debtors may designate a Stalking Horse Bid at any time before and up to the Sale Hearing. If a Stalking Horse Bid is designated after the filing of the Designation Re Stalking Horse, the Debtors will supplement the Designation Re Stalking Horse prior to the Sale Hearing.

[13] Pursuant to the Bid Procedures, the Debtors will notify all bidders whether or not their bids are Qualified Bids or not, no later than five (5) days before the Sale Hearing. In addition, in the event the Debtors do not designate any Stalking Horse Bid before the Sale Hearing, all Qualified Bids shall be designated Competing Bids (as defined in the Bid Procedures) for purposes of the Auction.

Assumed Contracts in order for such Assumed Contracts to be assumed and assigned. Such Contract Counterparty must file and serve an objection upon the Service Parties (the "Assumption and/or Cure Objection") setting forth (i) the basis for the objection (non-monetary or otherwise), and, if applicable, (ii) the amount the party asserts as the cure amount and/or the amount of all compensation for any actual pecuniary loss resulting from a default in respect of the Assumed Contracts (with appropriate documentation in support thereof). If no objection is received by the Cure Bar Date, the Cure Amounts attached to the Assumption Notice shall be controlling as to the amount necessary to be paid to cure under section 365(b)(1)(A) and (B), notwithstanding anything to the contrary in any Assumed Contract or other document, and the non-debtor Contract Counterparty to the Assumed Contract shall be forever barred from asserting any claims for the Cure Amount, including any other defaults, but not limited to pecuniary losses, that otherwise might or should have been asserted by the such Contract Counterparty to the Assumed Contracts, against the Debtors, any buyer or such other purchaser of the Purchased Assets, through the effective date of the assumption and assignment in respect of such Assumed Contract, and each Contract Counterparty to any Assumed Contracts shall be deemed to have consented to the assumption and assignment of the Assumed Contract to the purchaser of the Purchased Assets, subject to Paragraph 29-c below.

   c.  Notwithstanding anything herein to the contrary, if any Contract Counterparty to an Assumed Contract is not satisfied with the showing of adequate assurance of future performance, than such Contract Counterparty shall have the right to raise that objection to the Assumption Motion prior to the Auction at the time of the Sale Hearing.

   30. **Reply Papers**. The Debtors request that replies to any objections to the Sale Motion and to any Assumption and/or Cure Objection shall be filed and served no later than seven (7) days prior to the Sale Hearing. Service of reply papers shall be effected via the Court's ECF system, email or facsimile, where available, or via first class mail, postage prepaid, on the Service Parties and on the applicable objecting party.

## IV. DISCUSSION

### A. Applicable Law.

   31. Bankruptcy Code § 363(b) and Rule 6004 of the Federal Rules of Bankruptcy

Procedure authorize a debtor to sell assets of the estate other than in the ordinary course of business, after notice and a hearing. *See, e.g., Otto Preminger Films, Ltd. v. Qintex Entertainment, Inc. (In re Qintex Entertainment, Inc.)*, 950 F.2d 1492, 1495 (9th Cir. 1991). Courts will defer to a debtor's business judgment and allow a debtor broad discretion with respect to the procedures proposed to sell estate assets. *See, e.g., In re Blue Coal Corp.*, 168 B.R. 553, 572-573 (Bankr. M.D. Pa. 1994); *Official Committee of Subordinated Bondholders v. Integrated Resources, Inc.* (*In re Integrated Resources, Inc.*), 147 B.R. 650, 656-657 (Bankr. S.D.N.Y. 1992), *app. dismissed on jurisdictional grounds* 3 F.3d 49 (2d Cir. 1993). The goal in any sale of estate property is to maximize the return received by the estate. *See, e.g., Four B. Corp. v. Food Barn Stores, Inc.* (*In re Food Barn Stores, Inc.*), 107 F.3d 558, 564-565 (8th Cir. 1997) (in bankruptcy sales, "a primary objective of the Code [is] to enhance the value of the estate at hand"); *Integrated Resources*, 147 B.R. at 659 ("It is a well-established principle of bankruptcy law that the . . . [debtors'] duty with respect to such sales is to obtain the highest price or greatest overall benefit possible for the estate.")(citation and quotation omitted).

32.     Accordingly, courts uniformly recognize that procedures intended to enhance competitive bidding are consistent with the goal of maximizing the value received by the estate and therefore are appropriate in the context of bankruptcy sales. *See, e.g., In re Montgomery Ward Holding Corp.*, Case No. 97-1409 (PJW) (Bankr. D. Del. Aug 6, 1997); *In re Fruehauf Trailer Corp.*, Case No. 96-LS63 (PJW) (Bankr. D. Del. Feb. 26, 1997); *Integrated Resources*, 147 B.R. at 659 (such procedures "encourage bidding and to maximize the value of the debtor's assets").

33.     In accordance with Bankruptcy Rule 6004(f)(1), sales of property outside of the ordinary course of business may be by private sale or public auction. *See* Fed. R. Bankr. P. 6004(f)(1). Here, the Debtors believe that their ability to select the highest and best bidder at an auction enhances and benefits the marketing process by providing a motivation for bidders to submit a qualified bid with a high market value.

**B.     The Proposed Bid Procedures, Including The Break Up Fee, Are Fair, Reasonable And In The Best Interests Of Debtors' Estates.**

34.     Among the bid procedures commonly approved by bankruptcy courts is the

requirement that a competing bid exceed the stalking horse bid by a specified minimum amount. Sellers of assets often employ bidding protections in order to encourage the making of bids. Break-up fees and other arrangements, such as the Break-Up Fee proposed here, are "important tools to encourage bidding and to maximize the value of the Debtors' assets." *Integrated Resources*, 147 B.R. at 659.

35.    Historically, bankruptcy courts have approved bidding incentives similar to the Break-Up Fee under the "business judgment rule," which proscribes judicial second-guessing of the actions of a corporation's board of directors taken in good faith and in the exercise of honest judgment. *See, e.g., In re 995 Fifth Ave. Assocs., L.P.*, 96 B.R. 24, 28 (Bankr. S.D.N.Y. 1989) (bidding incentives may "be legitimately necessary to convince a 'white knight' to enter the bidding by providing some form of compensation for the risks it is undertaking") (citation omitted); *see also In re Integrated Resources,* 147 B.R. at 657-58 (listing three factors for determining whether to permit break-up fees: whether "the relationship of the parties who negotiated the break-up fee [is] tainted by self-dealing or manipulation," whether the "fee hamper[s], rather than encourage[s], bidding," and whether "the amount of the fee [is] unreasonable relative to the proposed purchase price"); *In re Hupp Indus., Inc.*, 140 B.R. 191, 194 (Bankr. N.D. Ohio 1992) (identifying factors in consideration of propriety of bid protections); *but see In re America West Airlines, Inc.,* 166 B.R. 908, 912 (Bankr. D. Ariz. 1994) (concluding that the standard is not whether a break-up fee is within the business judgment of the debtor, but instead, whether the transaction will "[f]urther the diverse interests of the debtor, creditors and equity holders, alike").]

36.    "It has become increasingly common in section 363 sales of significant portions of an estate's assets for the prospective buyer to demand a breakup fee or other protection in the event that the sale is not consummated." *In re Bethlehem Steel Corp.*, 2003 U.S. Dist. LEXIS 12909, at *30 (S.D.N.Y. July 28, 2003) (quoting *3 Collier on Bankruptcy* ¶ 363.03[7] (15th ed. 2002)). Typically, courts which limit or deny break-up fees do so because they find the fee or amount is not in the best interests of the various parties and/or the estate. *In re Bethlehem Steel Corp.*, 2003 U.S. Dist. LEXIS 12909, at *30; *see also Calpine Corp. v. O'Brien Envtl. Energy, Inc. (In re O'Brien Envtl. Energy, Inc.),* 181 F.3d 527 (3d Cir. 1999) (denying § 503 claim for break-up fee); *In re APP Plus, Inc.,* 223

B.R. 870 (Bankr. E.D.N.Y. 1998) (denying topping fee).

37.     The Debtors have formulated a bidding process that is fair and reasonable in view of the transaction size and type and which the Debtors believe will induce prospective competing bidders to present a bid.

38.     The Break-Up Fee is also fair and reasonable in amount in view of the effort and risks associated with being a "stalking horse."  Among other things, the Stalking Horse Bidder will need to expend significant time and resources and incur legal fees, in completing due diligence, negotiating the Purchase Agreement, ensuring it can satisfy all bidding requirements, closing conditions and representation and warranties, and participating at the Auction.  These efforts are complicated due to a number of factors, including different subsidiaries, satellite offices, off-site inventory and financed equipment, and issues particular to the business and laws of foreign jurisdictions.

39.     The Break-Up Fee benefits the estates because it assists in maximizing the value to the estates[14] by facilitating a sale of the Debtors' business assets as a going concern rather than in a "fire sale" liquidation which might occur in the absence of the Stalking Horse Bid. *See In re O'Brien Envtl. Energy, Inc.*, 181 F.3d at 537 (explaining that a break-up fee could be found to be a benefit to the estate where "assurance of a break-up fee promoted more competitive bidding").

40.     The Debtors do not believe that the $250,000 representing the amount of the Break-Up Fee is so substantial so as to chill other potential bidders from submitting competing bids. Rather, the capped amount is reasonable compared to the total consideration contemplated by the Sale and will only be paid if the assets are sold to a bidder other than the Stalking Horse Bidder, necessarily providing greater value for the Purchased Assets in light of the required initial minimum overbid.  Even in the absence of the Break-Up Fee, an incremental amount would be appropriate to assure that the Debtors are dealing with only serious bidders with the financial ability to complete a transaction without delay.

41.     The Break-Up Fee likely will encourage bidding in that interested purchasers are

---

[14] In the event the Debtors designate a Stalking Horse Bid and a Break-Up Fee will be paid (subject to Court approval), the Debtors will file one or more declarations further setting for the factual basis for the Debtors' determination that payment of the Break-Up Fee is reasonable.

1  more likely to submit bids and then negotiate and execute the Purchase Agreement with the

2  expectation that their reasonable expenses will be reimbursed and that they will receive

3  consideration for their Stalking Horse Bid. The Break-Up Fee will therefore "induc[e] a bid that

4  otherwise would not have been made and without which bidding would [be] limited." *See In re*

5  *O'Brien Envtl. Energy, Inc.*, 181 F.3d at 537. Similarly, the Stalking Horse Bid will provide a

6  minimum bid on which other bidders can rely, thereby "increasing the likelihood that the price at

7  which the [assets will be] sold will reflect [their] true worth." *Id.* Finally, the mere existence of the

8  Break-Up Fee will permit the Debtors to insist that competing bids for the Debtors' Assets be

9  sufficiently higher than that being offered by the Stalking Horse Bid, a clear benefit to the Debtors'

10  estates.

11      42. Notably, pursuant to the Bid Procedures, the Debtors are not required to designate a

12  Stalking Horse Bidder and therefore are not bound to payment of any Break-Up Fee. In such

13  instance, all Qualified Bidders may participate and submit competing bids at the Auction.

14  Therefore, in the instance the Debtors determine that bids submitted do not warrant payment of the

15  Break-Up Fee and that payment of the Break-Up Fee will not encourage higher bids or otherwise

16  benefit the estates, the Debtors may decline to designate any Stalking Horse Bid yet proceed with the

17  Auction.

18      43. Protection of opening bidders is the price paid for a debtor's enjoyment of the best of

19  both worlds - the assurance of a contractually bound purchaser at a fair price, on the one hand, and at

20  the same time the potential of an even better bid with the corresponding enhanced benefit to the

21  estate. The Debtors' ability to offer the Break-Up Fee enables them to ensure the Sale of the

22  Debtors' Assets to a contractually-committed bidder. Under the circumstances, the Debtors believe

23  the Break-Up Fee of $250,000 is reasonable and should be approved.

24      44. The Debtors believe that the foregoing Bid Procedures and the Break-Up Fee are fair,

25  reasonable, and are appropriately structured to ensure that the Debtors will obtain the best offer for

26  the Purchased Assets. The proposed Bid Procedures allow the Debtors to maximize the value of the

27  Purchased Assets while also ensuring that (a) only legitimate overbids are received from entities

28  interested in purchasing Debtors' interest in the Purchased Assets; and (b) any overbid is sufficient

to cover the Break-Up Fee required to be paid to any Stalking Horse Bidder if an overbid is accepted and the Sale is consummated. The Debtors further believe, in their reasoned business judgment, that the proposed Sale (subject to the Bid Procedures) is in the best interests of the estates and creditors because it will maximize the value of the Debtors' Purchased Assets.

**WHEREFORE**, the Debtors respectfully request that the Court enter its order as follows:

1.    Granting the Motion;

2.    Approving the Bid Procedures as set forth on **Exhibit "A"** hereto;

3.    Approving the Break-up Fee as an administrative expense under sections 503(b) and 507(a)(2) of the Bankruptcy Code, and authorizing the Debtors to pay the Break-up Fee as set forth herein;

4.    Specially scheduling the hearing on the Sale Motion and the Assumption Motion for July 7, 2014, at 9:00 a.m., or as soon as possible thereafter as the Court's calendar permits;

5.    Authorizing the Debtors to use the service lists maintained by their bankruptcy counsel for all mailings contemplated hereunder (rather than the Court's mailing matrix) in satisfaction of the requirements of Bankruptcy Local Rule 2002-1(c); and providing further, the Debtors may use (in addition to ISG) an outside copy service of their choosing to handle the duplication and mailing of all pleadings to be mailed in connection with the Sale, utilizing the service lists maintained by Debtors' counsel;

6.    Approving the timing and manner of notice and service of the Sale Notice, the Sale Motion (and related declarations), the Assumption Motion, the Assumption Motion (and related declarations), the Designation re Qualified Bids and any other related pleadings as proposed at Paragraphs 27 and 28 herein, and determining that such notice and timing and manner of service is adequate and reasonable under the circumstances;

7.    Approving the timing and manner for filing and service of objections to the Sale Motion and the Assumption Motion as proposed at Paragraph 29 herein;

8.    Approving the timing and manner for filing and service of replies to objections to the Sale Motion and to Assumption and/or Cure Objections as proposed at Paragraph 30 herein; and

/ / /

9.     For such other and further relief as the Court deems appropriate.

Dated: May 20, 2014                    **DORSEY & WHITNEY LLP**


By: /S/ *Thomas T. Hwang*
        Thomas T. Hwang
        Attorneys for Debtors