JOHN WALSHE MURRAY (074823)
STEPHEN T. O'NEILL (115132)
ROBERT A. FRANKLIN (091653)
THOMAS T. HWANG (218678)
DORSEY & WHITNEY LLP
305 Lytton Avenue
Palo Alto, CA  94301
Telephone:  (650) 857-1717
Facsimile:   (650) 857-1288
Email:  murray.john@dorsey.com
Email:  oneill.stephen@dorsey.com
Email:  franklin.robert@dorsey.com
Email:  hwang.thomas@dorsey.com

Attorneys for Debtors

UNITED STATES BANKRUPTCY COURT

NORTHERN DISTRICT OF CALIFORNIA

SAN JOSE DIVISION

| | |
|---|---|
| In re:<br><br>**CLEAREDGE POWER, INC.**,<br>Employer Tax I.D. No. 20-0119415<br><br>**CLEAREDGE POWER, LLC**<br>Employer Tax I.D. No. 06-1517615<br><br>**CLEAREDGE POWER INTERNATIONAL SERVICE, LLC**<br>Employer Tax I.D. No. 27-3468551<br><br>Debtor(s).<br><br>920 Thompson Place, Suite 100<br>Sunnyvale, California  94085 | Case No. 14-51955-CN-11<br><br><br><br>Case No. 14-51956-CN-11<br><br><br><br>Case No. 14-51960-CN-11<br><br>Cases Jointly Administered<br>Under Chapter 11<br><br>Date:  July 11, 2014<br>Time:  4:00 p.m.<br>Place:  280 S. First Street, Room 3070<br>           San Jose, CA 95113<br>Judge:  Honorable Charles Novack |

EXHIBIT "A"

TO

**MOTION BY DEBTORS TO APPROVE SALE OF CERTAIN ASSETS
FREE AND CLEAR OF LIENS, CLAIMS, ENCUMBRANCES AND OTHER INTERESTS**

EXHIBIT COVER

## ASSET PURCHASE AGREEMENT

This ASSET PURCHASE AGREEMENT, dated as of June 26, 2014 (this "Agreement"), is by and among ClearEdge Power, Inc., an Oregon corporation ("CEP"), ClearEdge Power, LLC, a Delaware limited liability company ("CEP LLC"), ClearEdge Power International Service, LLC, a Delaware limited liability company ("CEPIS," and collectively with CEP and CEP LLC, in their capacities as debtors and debtors in possession, the "Sellers"), and Doosan Corporation, a company organized under the laws of the Republic of Korea, on behalf of itself and/or its Purchaser Designee(s) (the "Purchaser"). Each of the Sellers and the Purchaser is referred to individually herein as a "Party" and collectively as the "Parties."

## RECITALS

WHEREAS, the Sellers filed for relief under Chapter 11 of Title 11 of the United States Code (the "Bankruptcy Code") by filing voluntary chapter 11 petitions commencing their cases (collectively the "Seller Chapter 11 Cases") in the United States Bankruptcy Court for the Northern District of California (the "Bankruptcy Court") on May 1, 2014 (the "Petition Date");

WHEREAS, the Sellers have agreed to transfer to the Purchaser, and the Purchaser has agreed to purchase and assume, pursuant to Sections 363 and 365 of the Bankruptcy Code, from Sellers, the Purchased Assets and the Assumed Liabilities, upon the terms and subject to the conditions contained in this Agreement, including obtaining an order of the Bankruptcy Court pursuant to Sections 105, 363 and 365 of the Bankruptcy Code authorizing the Transactions; and

WHEREAS, the Parties acknowledge and agree that the purchase by the Purchaser or the Purchaser Designees of the Purchased Assets, and the assumption by the Purchaser or the Purchaser Designees of the Assumed Liabilities, are being made at arm's length and in good faith and without intent to hinder, delay or defraud creditors of the Sellers and their Affiliates.

NOW, THEREFORE, in consideration of the foregoing and the representations, warranties, covenants and agreements contained in this Agreement and for other good and valuable consideration, the receipt and sufficiency of which is hereby acknowledged, the Parties hereto agree as follows:

## ARTICLE I

## DEFINITIONS

Section 1.1  Recitals. The recitals set forth above are incorporated by reference and are expressly made part of this Agreement.

Section 1.2  Definitions. The following definitions shall apply to and constitute part of this Agreement, the Disclosure Letter, the Purchaser Schedule and all Exhibits attached hereto:

"Accounting Firm" means Deloitte Touche Tohmatsu Limited or, if such firm is unable to serve in such capacity, such other nationally recognized independent accounting firm as either selected by the Parties or, if not so selected, assigned by the American Arbitration Association.

"Action" means any claim, as defined in the Bankruptcy Code, action, complaint, suit, litigation, arbitration, appeal, petition, inquiry, hearing, Order, decree, legal proceeding, investigation or other legal dispute, whether civil, criminal, administrative or otherwise, at law or in equity, by or before any Governmental Authority.

"Affiliate" means, with respect to any Person, any other Person that directly, or indirectly through one or more intermediaries, controls, is controlled by or is under common control with, such Person. For purposes of this definition, "control" (including, with correlative meaning, the terms "controlling" and "controlled") means the possession, directly or indirectly, of the power to direct or cause the direction of the management and policies of such Person, whether through ownership of voting securities, by contract or otherwise.

"Assignment and Assumption Agreement(s)" means one or more agreements, providing for the assignment by the Sellers of all of the Sellers' right, title and interest in and to the Purchased Assets, including the Assumed Contracts and Assumed Leases, free and clear of all Encumbrances (except Permitted Encumbrances) to the Purchaser and/or, as applicable, one or more Purchaser Designees, and the assumption by the Purchaser and/or, as applicable, one or more Purchaser Designees of the Assumed Liabilities, substantially in the form attached hereto as Exhibit A. At the election of the Purchaser, separate Assignment and Assumption Agreements (with appropriate modifications, as applicable) may be executed as to one or more Assumed Contracts, Assumed Leases and/or other Purchased Assets.

"Assignment of Intangible Property" means an assignment of intangible property to transfer the Purchased Assets that are intangible property to the Purchaser and/or, as applicable, one or more Purchaser Designees, free and clear of all Encumbrances (except Permitted Encumbrances), substantially in the form attached hereto as Exhibit B.

"Assumed Contracts" means, collectively, the Contracts of any Seller that are set forth on Schedule 1.2(a) of the Purchaser Schedule subject to revision by the Purchaser prior to the Designation Deadline as set forth in Section 2.7 (but excluding the Eliminated Agreements), which Contracts shall be assumed by the Sellers and assigned to the Purchaser and/or, as applicable, one or more Purchaser Designees pursuant to Section 365 of the Bankruptcy Code, the Assumption Order or other Order of the Bankruptcy Court and the Assignment and Assumption Agreement.

"Assumed Leases" means, collectively, the Leases that shall be set forth on Schedule 1.2(b) of the Purchaser Schedule (but excluding the Eliminated Agreements), which Leases shall be assumed by the Sellers and assigned to and assumed by the Purchaser and/or, as applicable, one or more Purchaser Designees pursuant to Section 365 of the Bankruptcy Code, the Assumption Order or other Order of the Bankruptcy Court and the Assignment and Assumption Agreement(s).

"Assumption Order" means a written Order of the Bankruptcy Court, substantially in the form attached hereto as Exhibit D, with such changes as Purchaser and Sellers may each have ap-

proved in their reasonable discretion, that has not been stayed, vacated or stayed pending appeal, authorizing, in addition to the matters referred to in Section 3.3, the assumption by the Sellers and assignment to the Purchaser and/or one or more Purchaser Designee(s) pursuant to section 365 of the Bankruptcy Code of the Assumed Contracts and Assumed Leases.

"Audited Financial Statements" means the audited consolidated balance sheets (including the consolidating balance sheet), and the related consolidated statements of operations, consolidated statement of changes in stockholders' equity and consolidated statement of cash flows, of CEP as of and for the fiscal years ended December 31, 2012 and 2011, together with the notes thereto.

"Benefit Plan" means each compensatory or employee benefit plan, policy, program, arrangement or agreement (including any collective bargaining or works council agreement), whether or not written, including any employee welfare benefit plan within the meaning of Section 3(1) of the Employee Retirement Income Security Act of 1974, as amended ("ERISA"), any employee pension benefit plan within the meaning of Section 3(2) of ERISA (whether or not such plan is subject to ERISA) and any bonus, incentive, deferred compensation, vacation, stock purchase, stock option, severance, workers compensation, employment, change of control or fringe benefit plan, program or agreement (a)(i) in which any Service Provider participates or has participated or is or has been eligible to participate or (ii) pursuant to which any Service Provider receives or has received payments or benefits and (b)(i) that is or has been sponsored, maintained or contributed to by any Seller or by any trade or business, whether or not incorporated, which together with any Seller would be deemed a "single employer" under subsection (b), (c), (m) or (o) of Section 414 of the Code (an "ERISA Affiliate") or (ii) with respect to which any Seller or ERISA Affiliates has, or could reasonably be expected to have, any Liability.

"Bill of Sale" means the bill of sale to transfer the Purchased Assets to the Purchaser and/or, as applicable, one or more Purchaser Designees free and clear of all Encumbrances (except Permitted Encumbrances), substantially in the form attached hereto as Exhibit C.

"Books and Records" means all documents of, or otherwise in the possession, custody or control of, or used by, the Sellers in connection with, or relating to, the Purchased Assets, the Assumed Liabilities, or the operations of the Sellers, including all files, data, reports (including environmental reports and assessments), plans, mailing lists, supplier lists, customer lists, price lists, marketing information and procedures, advertising and promotional materials, equipment records, warranty information, architects agreements, construction contracts, drawings, plans and specifications, records of operations, standard forms of documents, manuals of operations or business procedures and other similar procedures (including all discs, tapes and other media-storage data containing such information).

"Business" means the business of the Sellers, including the designing, manufacturing, selling and servicing distributed generation fuel cell systems for commercial, industrial, utility and residential applications, as currently conducted and as historically conducted prior to the Petition Date.

"Business Day" means any day other than a Saturday, Sunday or other day on which commercial banks in New York City, New York or Seoul, Republic of Korea are authorized or obligated to close under applicable Laws.

Case: 14-51955    Doc# 148-1    Filed: 06/30/14    Entered: 06/30/14 13:44:57    Page 4 of 20

"Closing Documents" means any agreements, instruments and other documents to be delivered at the Closing pursuant to Section 7.2 or Section 7.3.

"Code" means the Internal Revenue Code of 1986, as amended.

"Competing Transaction" means any direct or indirect financing, refinancing, acquisition, sale, divestiture (including by merger, acquisition or other business combination), public offering, recapitalization, business combination or reorganization, whether in one transaction or a series of related transactions, of or involving or implicating all or any material part of the Purchased Assets or the Assumed Liabilities, other than any such transaction or series of related transactions with the Purchaser or any Affiliate thereof.

"Consent" means any consent, approval, concession, grant, waiver, exemption, license, entitlement, suitability determination, franchise, development right, certificate, variance, registration, permit, Order or other authorization of or notice of any Person.

"Contract" means any contract, agreement, understanding, arrangement, purchase order, sales order, license, sub-license, instrument or commitment (in each case, whether oral or written) that is or purports to be binding upon any Seller or any assets or property thereof (or subjects any such assets or property to an Encumbrance).

"Deposit Escrow Agreement" means the escrow agreement, in form and substance mutually acceptable to the Parties, by and among the Sellers, the Purchaser and an escrow agent mutually acceptable to the Parties, with respect to the Purchase Price Deposit.

"Encumbrances" means all mortgages, pledges, charges, liens, interests, debentures, trust deeds, claims and encumbrances, of any type whatsoever (whether known or unknown, secured or unsecured or in the nature of setoff or recoupment, choate or inchoate, filed or unfiled, scheduled or unscheduled, noticed or unnoticed, recorded or unrecorded, perfected or unperfected, allowed or disallowed, contingent or non-contingent, liquidated or unliquidated, matured or unmatured, material or nonmaterial, disputed or undisputed, whether arising prior to or subsequent to the commencement of the Seller Chapter 11 Cases, and whether imposed by agreement, understanding, Law, equity, or otherwise, including claims otherwise arising under doctrines of successor liability), assignments by way of security or otherwise, security agreements and interests, conditional sales contracts or other title retention agreements, rights of first refusal, negotiation or offer or options to purchase or similar interests or instruments charging, or creating a security interest in the Purchased Assets or any part thereof or interest therein, and any agreements, leases, licenses, occupancy agreements, options, easements, rights of way, covenants, conditions, restrictions, declarations, defects in title, encroachments, executions or other encumbrances (including notices or other registrations in respect of any of the foregoing) affecting title to the Purchased Assets or any part thereof or interest therein, other than any options or other rights which are for the express benefit of the Sellers which are included in the Assumed Leases or Assumed Contracts.

"Environmental Laws" means all applicable Laws relating to pollution or protection of human health, safety or the environment (including ambient air, water, surface water, groundwater, land surface, soil or subsurface) or natural resources, including applicable Laws relating to the gen-

- 4 -

Case: 14-51955   Doc# 148-1   Filed: 06/30/14   Entered: 06/30/14 13:44:57   Page 5 of 20

eration, storage, transfer, transportation, investigation, cleanup, treatment, remediation, or use of, or release or threatened release into the environment of, any Hazardous Substances.

"Environmental Permits" means all Permits issued pursuant to Environmental Laws.

"Equipment" means all machinery, equipment, apparatus, appliances, implements, industrial materials, supplies, property, furniture, fixtures, furnishings, vehicles, spare parts, leasehold alterations and improvements, artwork, desks, chairs, tables, computer and computer-related hardware, software and firmware, files, documents, network and internet and information technology systems-related equipment, copiers, telephone lines and numbers, facsimile machines and other telecommunication equipment, cubicles and miscellaneous office furnishings and supplies, maintenance equipment, tools, signs and signage, and other tangible and intangible property, including all other fixed assets and items of personal property used or held for use in the conduct of the Business or otherwise owned by the Sellers, which shall include all servers and computers used to develop and maintain code in various operating environments, all development environment and software currently residing on such computers.

"Excluded Agreements" means, collectively, the Excluded Leases and all Contracts other than the Assumed Contracts.

"Excluded Leases" means Leases of any Seller other than the Assumed Leases, including all options to renew, purchase, expand or lease (including rights of first refusal, first negotiation and first offer), all credit for the prepaid rent associated therewith, and all security deposits and other deposits made in connection with such Leases.

"Excluded Taxes" means any (i) Taxes imposed on or payable by the Sellers or their Affiliates for any taxable period; (ii) Taxes imposed on or with respect to the Purchased Assets, the Business or the Assumed Liabilities for any Pre-Closing Tax Period; (iii) Taxes imposed on or with respect to the Excluded Assets or the Excluded Liabilities for any taxable period; (iv) Taxes (other than Transfer Taxes) imposed on or with respect to the sale of the Purchased Assets pursuant to Section 2.1, any transaction entered into by the Sellers or their Affiliates in anticipation of such sales, or any other transaction contemplated by this Agreement (including any action or transaction contemplated by Section 5.4); (v) Transfer Taxes for which the Sellers are responsible pursuant to Section 7.4(a); and (vi) Liability of the Purchaser or any of its Affiliates for Taxes of any other Person as a transferee or successor, by contract, operation of law or otherwise.

"final, non-appealable" (including, with correlative meaning, the term "final and non-appealable") means, with respect to any Order or other action of a Governmental Authority, an Order or other action (a) as to which no appeal, notice of appeal, motion to amend or make additional findings of fact, motion to alter or amend judgment, motion for rehearing or motion for new trial has been timely filed or, if any of the foregoing has been timely filed, it has been disposed of in a manner that upholds and affirms the subject Order in all material respects without the possibility for further appeal or rehearing thereon; and (b) as to which the time for instituting or filing an appeal, motion for rehearing or motion for new trial shall have expired, excluding any additional time periods that may begin as a result of Federal Rule 60(b).

"Financial Statements" means, collectively, the Audited Financial Statements and the Unaudited Financial Statements.

"GAAP" means U.S. generally accepted accounting principles in effect from time to time.

"Governmental Authority" means any domestic, foreign, federal, state, provincial or local authority, legislative body, court, government, regulatory agency, self-regulatory organization (including any securities exchange), commission, board, arbitral or other tribunal, or any political or other subdivision, department or branch of any of the foregoing.

"Hazardous Substances" means any material, substance or waste defined, characterized or regulated as hazardous, toxic, a pollutant or a contaminant under Environmental Laws, including without limitation asbestos or any substance containing asbestos, formaldehyde, polychlorinated biphenyls, lead paint and petroleum or petroleum products (including crude oil and any fraction thereof), and by-products of any or all of the foregoing.

"Hearing" means the hearing or hearings to be held by the Bankruptcy Court to consider the Sale Order, the Assumption Order and the approval of the Transaction.

"Improvements" means all buildings, building systems, structures, fixtures and improvements which are permanently affixed to and constitute a part of the Leased Real Property.

"Indebtedness" of any Person means, without duplication, (a) all obligations of such Person for borrowed money or advances; (b) all obligations of such Person evidenced by bonds, debentures, notes, loan agreements or similar instruments; (c) all obligations of such Person under conditional sale or other title retention agreements relating to property purchased by such Person (even though the rights and remedies of the seller or lenders under such agreement in the event of default are limited to repossession or sale of such property); (d) all obligations of such Person issued or assumed as part of the deferred purchase price of property or services; (e) all indebtedness secured by any Encumbrance on property owned or acquired by such Person (including indebtedness arising under conditional sales or other title retention agreements), whether or not the obligations secured thereby have been assumed; (f) any obligations with respect to bank guarantees, deferred compensation arrangements, workers' compensation liabilities, employee medical liabilities, bonuses and any required statutory payments to employees; (g) all obligations of such Person for the reimbursement of any obligor in respect of letters of credit, letters of guaranty, bankers' acceptances and similar credit transactions; and (h) all contingent obligations of such Person in respect of Indebtedness or obligations of others of the kinds referred to in clauses (a) through (g) above.

"Intellectual Property Rights" means trade or brand names, business names, trademarks (including logos), trademark registrations and applications, service marks, service mark registrations and applications, copyrights, copyright registrations and applications, all rights to use the name "ClearEdge Power," any other name of a Seller and any related or associated name, internet domain names, all national (of any country of origin) and multinational patents, patent applications and provisional patent applications, and reissues, divisions, continuations, continuations-in-part, continuing patent applications, extensions and reexaminations thereof, issued patents, pending applications and other patent rights, industrial design registrations, pending applications and oth-

- 6 -

Case: 14-51955   Doc# 148-1   Filed: 06/30/14   Entered: 06/30/14 13:44:57   Page 7 of 20

er industrial design rights, trade secrets, proprietary information and know-how, equipment and parts lists and descriptions, instruction manuals, inventions, inventors' notes, research data, blueprints, drawings and designs, formulae, processes, computer programs and software (including applications, source code, object code, executable code, firmware, data, databases and technical documentation), internal-use software, and technical manuals and documentation (including user and operational guides) used in connection therewith, technology and other intellectual property, together with all rights under licenses or sub-licenses or other arrangements, registered user agreements, technology transfer agreements, all rights to any of the foregoing provided by multinational treaties or conventions or the laws of the United States or any state or jurisdiction worldwide, other agreements or instruments relating to any of the foregoing, and goodwill associated with any of the foregoing.

"Inventory" means all raw materials, work-in-process, finished goods, supplies, samples (including samples held by sales representatives), components, packaging materials, and other inventories to which any Seller has title that are in the possession or custody of any Seller or any third party and used or held for use in connection with the Business or any of the Purchased Assets.

"Knowledge" means, with respect to any Seller, as of any date, the actual knowledge, after due inquiry including of their respective direct reports and consulting with employees whom they determined in good faith were likely to have knowledge or responsive information with respect to such fact or matter, of Gloria Fan, Shelley Hilderbrand, Paul Rescsanski, Paul Atchison, Sathya Motupally, John Eastburn, Zakiul Kabir, Bill Ferone, Kent McCord, Sridhar Kanuri, Glen Cobb and Tom Skiba.

"Laws" means all statutes, laws (including common law), regulations, rules, ordinances, codes and other requirements of any Governmental Authority, including any Orders.

"Leases" means all agreements to lease, leases, renewals of leases, subtenancy agreements and occupancy agreements and other rights (including licenses) together with all amendments, modifications, renewals and extensions thereof or thereafter, granted by or on behalf of, or to, any Seller or any of their respective predecessors in title, as lessee, licensee, lessor or licensor, or any of the foregoing under which any Seller has any rights or obligations, together with all guarantees and indemnities relating thereto.

"Liability" means any liability, Indebtedness, guaranty, claim, loss, damage, deficiency, assessment, responsibility, "claim" (as defined in Section 101(5) of the Bankruptcy Code) or obligation of whatever kind or nature (whether known or unknown, whether asserted or unasserted, whether absolute or contingent, whether accrued or unaccrued, whether liquidated or unliquidated, whether due or to become due, whether determined or determinable, whether choate or inchoate, whether secured or unsecured, whether matured or not yet matured) and including all costs, fees and expenses relating thereto.

"Material Adverse Effect" means any change, effect, event, occurrence, state of facts or development that, individually or in the aggregate, has had, or would be reasonably be expected to have, a material adverse effect on (i) the assets, liabilities, properties, business, affairs, condition (financial or otherwise), or capitalization of the Business or any of the Purchased Assets or the Assumed Liabilities; provided, however, that the fact that the Seller Chapter 11 Cases have been

filed and that, accordingly, the Sellers have been conducting the Business in the ordinary course of business as the same is being conducted as of the date of this Agreement in the Seller Chapter 11 Cases, shall not, in and of itself, be deemed to be a Material Adverse Effect for purposes clause (i) of this definition, or (ii) the Sellers' ability to consummate the transactions contemplated by this Agreement pursuant to the terms hereof.

"Order" means any order, writ, judgment, injunction, decree, stipulation, certification, determination, decision, verdict, ruling, subpoena, or award entered by or with any Governmental Authority (whether temporary, preliminary or permanent).

"Outside Date" means July 18, 2014.

"Party" or "Parties" has the meaning set forth in the preamble.

"Patent and IP Related Documentation" means each of the following in paper, digital or other form, to the extent existing as of the date hereof or the Closing Date: (i) the physical and electronic patent prosecution files and dockets relating to any of the Purchased IP (including all original granted patents and patent prosecution files held by prosecuting attorneys); (ii) invention disclosures in respect of Purchased IP; (iii) RAND / FRAND and other statements, assurances, declarations, agreements, or undertakings made to standards-setting organizations with respect to the Purchased IP; (iv) litigation files to the extent relating to Actions brought for infringement of the Purchased IP; (v) copies of outbound license agreements and cross-license agreements to the extent related to the Purchased IP; (vi) ribbon copies of all of the Purchased IP that are patents; (vii) infringement claim charts for the Purchased IP prepared by or for any of the Sellers; (viii) all books, records, files, ledgers or similar documents stored in any of the Sellers' document management systems used to track, organize or maintain Purchased IP; (ix) copies of acquisition agreements relating to stand-alone acquisitions of patents by any of the Sellers to the extent relating to the Purchased IP; and (x) assignment agreements to the extent relating to the Purchased IP.

"Permitted Encumbrance" means any Encumbrance that is not extinguished by the Sale Order under applicable Law, it being understood that the Sale Order shall extinguish Encumbrances to the maximum extent permissible under applicable Law.

"Person" means an individual, partnership, limited liability company, corporation, trust, joint venture, association, joint stock company, unincorporated organization, Governmental Authority or other entity, and the successors and assigns thereof or the heirs, executors, administrators or other legal representatives of an individual.

"Purchaser Designee" means one or more Affiliates of the Purchaser or any other Person or Persons designated by the Purchaser, and reasonably acceptable, to the Sellers prior to the Closing.

"Purchaser Schedule" means the schedule first delivered by the Purchaser to the Sellers on the date of this Agreement and updated after the date of this Agreement in accordance with Section 2.7.

"Reimbursable Expenses" means and includes all out-of-pocket costs, fees and expenses incurred or to be incurred by the Purchaser or its Affiliates in connection with evaluating, negotiating, documenting and performing the Transaction (including fees, costs and expenses of any profes-

Case: 14-51955    Doc# 148-1    Filed: 06/30/14    Entered: 06/30/14 13:44:57    Page 9 of 20

sionals (including financial advisors, outside legal counsel, accountants, experts and consultants) retained by the Purchaser or its Affiliates in connection with or related to the authorization, preparation, investigation, negotiation, execution and performance of this Agreement, the transactions contemplated hereby, including the Seller Chapter 11 Cases and other judicial and regulatory proceedings related to such transactions); provided, that in no event shall the Reimbursable Expenses exceed $1.5 million.

"Representative" means, with respect to a particular Person, any director, officer, manager, partner, member, employee, agent, consultant, advisor or other representative of such Person, including legal counsel, accountants, and financial advisors.

"Retained Books and Records" means (A) any documents (including books and records) that the Sellers are required by applicable Law to retain, (B) corporate seals, minute books, charter documents, corporate stock record books, original tax records and such other books and records as pertain to the organization, or share capitalization of any of the Sellers, and (C) any books and records or information related exclusively to any of the Excluded Assets or Excluded Liabilities.

"Sale Order" means a written Order of the Bankruptcy Court, substantially in the form attached hereto as Exhibit E with such changes as Purchaser and Sellers may each have approved in their reasonable discretion that has not been stayed, vacated or stayed pending appeal, authorizing, in addition to the matters referred to in Section 3.3, the sale of the Purchased Assets to the Purchaser and/or, as applicable, one or more Purchaser Designees upon the terms and subject to the conditions contained in this Agreement and the consummation of the Transaction.

"Sale Procedures Motion" means the *Motion to Approve Bid Procedures and Related Matters Re Sale of Certain Assets of the Debtors* filed by the Sellers with the Bankruptcy Court on May 15, 2014.

"Sale Procedures Order" means a written Order of the Bankruptcy Court that has not been stayed, vacated or stayed pending appeal, substantially in the form attached hereto as Exhibit F, with such changes as Purchaser and Sellers may each have approved in their reasonable discretion.

"Service Providers" means the current and former directors, officers, employees, consultants and independent contractors of the Sellers and their Subsidiaries.

"Subsidiary" means, with respect to any Person, (a) any other Person that directly, or indirectly through one or more intermediaries, is controlled by such Person; or (b) any other Person where a majority of its equity interests are held, directly, or indirectly through one or more intermediaries, by such Person. For purposes of this definition, "control" (including, with correlative meaning, the terms "controlling" and "controlled") means the possession, directly or indirectly, of the power to direct or cause the direction of the management and policies of such Person, whether through ownership of voting securities, by contract or otherwise.

"Tax" or "Taxes" means any federal, state, local or foreign taxes, charges, fees, imposts, levies or other assessments, including, without limitation, all net income, gross income, gross receipts, windfall profit, severance, property, production, sales, use, license, excise, franchise, employment, unemployment, payroll, withholding, alternative or add on minimum, ad valorem, value

added, transfer, stamp, or environmental tax, escheat payments or any other tax, custom, duty, impost, levy, governmental fee or other like assessment or charge (together with any and all interest, penalties, additions to tax and additional amounts imposed with respect thereto).

"Tax Proceeding" means any audit, examination, investigation or other administrative or judicial proceeding with or against any Taxing authority or otherwise with respect to Taxes.

"Tax Return" or "Tax Returns" means all returns, affidavits, declarations of estimated tax payments, reports, estimates, information returns and statements, including any related or supporting information with respect to any of the foregoing, filed or required to be filed with any taxing authority.

"Transaction Documents" means this Agreement and all agreements, documents or instruments entered into or executed and delivered by any Party pursuant to this Agreement and in accordance with its terms.

"Transactions" means the transactions contemplated herein to be consummated at the Closing, including the purchase and sale of the Purchased Assets and the delegation and assumption of the Assumed Liabilities provided for in this Agreement.

"Transfer Taxes" means any transfer, documentary, excise, sales, use, property, gains, value-added, stamp, registration and other such Taxes, any conveyance fees, any recording charges and any other similar fees and charges (including penalties and interest in respect thereof.

"Unaudited Financial Statements" means the unaudited consolidated balance sheets, and the related unaudited consolidated statements of operations, consolidated statement of changes in stockholders' equity and consolidated statement of cash flows, of CEP as of and for the three (3)-month period ended March 31, 2014 and as of and for the fiscal year ended December 31, 2013, in each case together with the notes thereto (if any) and for the three (3) month period ended March 31, 2014, subject to normal year-end audit adjustments in accordance with GAAP and past practice which will not be material individually or in the aggregate.

Section 1.3  Other Terms. As used in this Agreement, any reference to any federal, state, local, or foreign law, including any applicable Law, will be deemed also to refer to all rules and regulations promulgated thereunder and all amendments or modifications thereto, unless the context requires otherwise. The words "include," "includes," and "including" will be deemed to be followed by "without limitation." Pronouns in masculine, feminine, or neuter genders will be construed to include any other gender, and words in the singular form will be construed to include the plural and vice versa, unless the context otherwise requires. References to "this Agreement" shall include all Exhibits, Schedules and other agreements, instruments or other documents attached hereto. The words "herein," "hereof," "hereby," "hereunder," and words of similar import refer to this Agreement as a whole and not to any particular subdivision unless expressly so limited. References in this Agreement to Articles, sections, Schedules or Exhibits are to Articles or sections of, Schedules or Exhibits to, this Agreement, except to the extent otherwise specified herein. References to the consent or approval of any Party shall mean the written consent or approval of such Party, which may be withheld, conditioned or delayed in such Party's sole and absolute discretion, except to the extent otherwise specified herein. Any agree-

ment, instrument or statute defined or referred to herein shall mean such agreement, instrument or statute as from time to time amended, modified or supplemented, including (in the case of agreements or instruments) by waiver or consent and (in the case of statutes) by succession of comparable successor statutes and references to all attachments thereto and instruments incorporated therein. The headings of the sections, paragraphs and subsections of this Agreement are inserted for convenience only and are not part of this Agreement and do not in any way limit or modify the provisions of this Agreement and shall not affect the interpretation hereof. Unless otherwise specified herein, payments that are required to be made under this Agreement shall be paid by wire transfer of immediately available funds to an account designated in advance by the Party entitled to receive such payment.

Section 1.4  Interpretation. The Parties have participated jointly in the negotiation and drafting of this Agreement. If an ambiguity or question of intent or interpretation arises, this Agreement will be construed as if drafted jointly by the Parties hereto and no presumption or burden of proof will arise favoring or disfavoring any Party hereto because of the authorship of any provision of this Agreement.

## ARTICLE II

## AGREEMENT OF PURCHASE AND SALE

Section 2.1  Purchase and Sale of Assets. The Sellers hereby agree to sell, transfer, assign, convey and deliver to the Purchaser and/or one or more Purchaser Designees, at the Closing, and Purchaser hereby agrees to purchase, acquire and assume, or cause one or more Purchaser Designees to purchase, acquire and assume, from the Sellers at the Closing, upon the terms and subject to the conditions of this Agreement, all right, title and interest of the Sellers of any nature whatsoever in the following assets (collectively, the "Purchased Assets"), free and clear of any and all Encumbrances of any and every kind, nature and description, other than Permitted Encumbrances:

(a)  the Assumed Leases and all real property and rights thereunder, including all options to renew, purchase, expand or lease (including rights of first refusal, first negotiation and first offer), and all credit for the prepaid rent associated therewith and all security deposits made in respect of such Assumed Leases and any real property improvements thereon;

(b)  all Equipment and Improvements (other than any Equipment or Improvements expressly set forth on Schedule 2.2(a)(vii) of the Purchaser Schedule as Excluded Assets);

(c)  all Inventory (other than any Inventory expressly set forth on Schedule 2.2(a)(vii) of the Purchaser Schedule as Excluded Assets);

(d)  all real, personal and intangible property Taxes ("Property Taxes") with respect to the Purchased Assets that are prepaid and not attributable to Pre-Closing Tax Periods;

(e)  the Assumed Contracts and all rights thereunder;

(f) all Intellectual Property Rights owned or used by or licensed to (in whole or in part) any Seller, worldwide, and the right to royalty income (other than solely to the extent becoming due and payable to any Seller prior to the Closing Date) associated therewith (collectively, the "Purchased IP") and all Patent and IP Related Documentation;

(g) all advertising, marketing and promotional materials and all other printed or written materials;

(h) all Books and Records, other than Retained Books and Records;

(i) all rights of the Sellers under any non-disclosure or confidentiality, non-compete or non-solicitation agreements, to the extent such agreement relates to the Purchased Assets (or any portions thereof);

(j) all permits, licenses, authorizations, approvals, consents and certificates (including all certificates of occupancy, building, fire, health and safety permits, and environmental permits) issued or granted by any Governmental Authority (collectively, "Permits") which are transferable under applicable Law to the extent related to the other Purchased Assets;

(k) any and all insurance proceeds, condemnation awards or other compensation in respect of loss or damage to any Purchased Asset to the extent occurring on or after the date hereof, and all right and claim of the Sellers to any such insurance proceeds, condemnation awards or other compensation not paid by the Closing;

(l) all rights, claims, actions, rebates, refunds, causes of action, choses in action, actions, suits or proceedings, hearings, audits, rights of recovery, rights of setoff, rights of recoupment, rights of reimbursement, rights of indemnity or contribution and other similar rights (known and unknown, matured and unmatured, accrued or contingent, regardless of whether such rights are currently exercisable) against any Person, including all warranties, representations, guarantees, indemnities and other contractual claims (express, implied or otherwise) to the extent related to the Purchased Assets or the Assumed Liabilities (including any claims for past infringement or misappropriation);

(m) all avoidance claims or causes of action available to the Sellers under Chapter 5 of the Bankruptcy Code (including Sections 544, 545, 547, 548, 549, 550 and 553) or any similar actions under any other applicable law (collectively, "Avoidance Actions") against the following (the "Designated Parties"): any of the Sellers' (i) vendors, suppliers, customers or trade creditors with whom the Purchaser continues to conduct business in regard to the Purchased Assets after the Closing, (ii) the Sellers' counterparties under any licenses of Intellectual Property that are Assumed Contracts or counterparties under any other Assumed Contracts or Assumed Leases and (iii) any affiliates of any of the Persons listed in clauses (i) through (ii); provided, however, that it is understood and agreed by the Parties that (A) the Purchaser will not pursue or cause to be pursued any Avoidance Actions against any of the Designated Parties other than as a defense (to the extent permitted under applicable law) against any claim or cause of action raised by any Deisgnated Party and (B) notwithstanding the purchase of such Avoidance Actions

- 12 -

by the Purchaser, the Sellers shall retain the right to use such Avoidance Actions as a defense (to the extent permitted under applicable law) against any claim or cause of action raised against any Seller by any Designated Party in connection with the reconciliation of bankruptcy claims against the Sellers;

(n) all security and utility deposits, credits, allowance, prepaid rent or other assets, or charges, setoffs, prepaid expenses, and other prepaid items related to the Purchased Assets;

(o) all of the Sellers' trade accounts or notes receivable (whether current or noncurrent) and any other receivables of the Sellers, in each case arising prior to or on the Closing Date;

(p) all proceeds of any settlement from and after the date hereof through the Closing of any claims, counterclaims, rights of offset or other causes of action of any Seller against any Designated Party;

(q) all rights of the Sellers in and to any architects' construction or other agreements in connection with any Leased Real Property, and all warranties and guaranties with respect thereto;

(r) all rights of the Sellers in and to any restricted cash, security deposits, escrow deposits and cash collateral, including cash collateral given to obtain or maintain letters of credit and cash drawn or paid on letters of credit;

(s) all Encumbered Assets to the extent that all of the lenders under the applicable Secured Facility secured by an Encumbrance on such Encumbered Assets shall have made a Sale Election in accordance with Section 2.4 (provided that, to the extent that any such Encumbered Asset constitutes a Contract, such Contract shall be an Assumed Contract); and

(t) any other personal property of, in the possession or custody of, the Sellers unless such property is an Excluded Asset.

Section 2.2    Excluded Assets.

(a) Sellers shall retain all right, title and interest to, in and under all assets other than the Purchased Assets (such assets to be retained by the Sellers, the "Excluded Assets"), and the Excluded Assets shall include the following assets, properties and rights of the Sellers:

(i) the Excluded Agreements and any and all rights thereunder;

(ii) any prepaid Property Taxes with respect to the Purchased Assets that are attributable to Pre-Closing Tax Periods and any refund of Excluded Taxes;

(iii) any capital stock or other securities of any Seller held in any Person, including, without limitation, all equity interests in ClearEdge Power Corp., a California corporation, Transit Leasing, Inc., a Delaware company, ClearEdge Power Finance, LLC, a Delaware limited liability company, and ClearEdge Power International Service Korea, LLC, a Korean company;

(iv) Retained Books and Records; provided that Sellers shall provide (for which the Purchaser shall reimburse the Sellers for their reasonable documented, out of pocket costs and expenses), the Purchaser or its Affiliates with a copy (and shall allow the Purchaser or its Affiliates to make a copy) of any Retained Books and Records that are related to the Purchased Assets or the Assumed Liabilities;

(v) the assets of any Benefit Plan;

(vi) all cash and cash equivalents, other than any and all rights of the Sellers in and to any restricted cash, security deposits, escrow deposits and cash collateral (including cash collateral given to obtain or maintain letters of credit and cash drawn or paid on letters of credit);

(vii) any assets set forth on Schedule 2.2(a)(vii) of the Purchaser Schedule;

(viii) (A) any Avoidance Actions against any Person other than any Designated Party, (B) any proceeds of any settlement from and after the date hereof through the Closing of any claims, counterclaims, rights of offset or other causes of action of any Seller against any Person other than any Designated Party, (C) all rights to use such Avoidance Actions as a defense (to the extent permitted under applicable law) against any claim or cause of action raised against any Seller by any Designated Party in connection with the reconciliation of bankruptcy claims of the Designated Parties against the Sellers, and (D) all claims or causes of action of the Sellers other than those identified in Sections 2.1(l) and 2.1(m) above; and

(ix) any Encumbered Assets, unless all of the lenders under the applicable Secured Facility secured by an Encumbrance on such Encumbered Assets shall have made a Sale Election in accordance with Section 2.4.

(b) Notwithstanding anything in this Agreement to the contrary, the Purchaser may, in its sole and absolute discretion, at any time on or prior to the date that is three (3) Business Day before the Closing Date, elect not to acquire any of the assets, properties and rights of any Seller, and any asset so designated by the Purchaser shall be an Excluded Asset for all purposes hereunder; provided, however, that with respect to Contracts and Leases, such designation shall be made in accordance with Section 2.7.

Section 2.3  Condition of Conveyance. Without limiting the provisions of this Agreement relating to the Assignment and Assumption Agreement or any other provisions of this Agreement relating to the sale, transfer, assignment, conveyance or delivery, the Purchased Assets and the Assumed Liabilities shall be sold, transferred, assigned, conveyed and delivered by

- 14 -

the Sellers to the Purchaser and, as applicable, one or more Purchaser Designees, by appropriate instruments of transfer, bills of sale, endorsements, assignments and deeds, in recordable form as appropriate, and free and clear of any and all Encumbrances of any and every kind, nature and description. Sellers agree to comply with the Connecticut Transfer Act, C.G.S. Section 22a-134 et seq. (the "Transfer Act"), in connection with the purchase and sale of the Purchased Assets hereunder as transferor and as "certifying party" (as that term is defined or used in the Transfer Act).

Section 2.4    Purchase Price. Subject to the terms and conditions hereof and the entry and effectiveness of the Sale Order and the Assumption Order, the purchase price (the "Purchase Price") for the purchase, sale, assignment and conveyance of the Sellers' right, title and interest in, to and under the Purchased Assets shall be equal to the sum of (a) $20,000,000 (the "Base Purchase Price") for all Purchased Assets that are not subject to an Encumbrance securing a credit facility set forth on Schedule 2.4 of the Purchaser Schedule (each, a "Secured Facility") and (b) to the extent that all of the lenders with respect to any Secured Facility elect to consent to sale of all of the assets of the Sellers subject to an Encumbrance securing such Secured Facility (the "Encumbered Assets") to the Purchaser and/or, as applicable, one or more Purchaser Designees, free and clear of all such Encumbrances pursuant to section 363(f) of the Bankruptcy Code (a "Sale Election"), no later than the commencement of the Auction, the amount set forth on Schedule 2.4 of the Purchaser Schedule with respect to such Secured Facility (the "Supplemental Purchase Price"); provided, however, that any Sale Election must comply with the requirements of such Sale Election set forth on Schedule 2.4.

Section 2.5    No Liabilities Assumed. Notwithstanding anything in this Agreement to the contrary, except for those Liabilities set forth on Schedule 2.5 of the Purchaser Schedule (which, to the extent applicable, shall supersede any Excluded Liabilities set forth below), those Liabilities relating to the performance of obligations arising solely after the Closing Date under the Assumed Contracts and Assumed Leases, all Cure Costs solely with respect to the Assumed Contracts and the Assumed Leases (provided, however, that, notwithstanding anything to the contrary herein, (i) to the extent that the actual aggregate amount of liability for Cure Costs for all Assumed Contracts and Assumed Leases exceeds $12,899,000 (such excess, the "Aggregate Retained Cure Costs"), the Purchase Price shall be reduced dollar-for-dollar for all purposes under this Agreement by the amount of the Aggregate Retained Cure Costs and (ii) to the extent that the actual amount of liability for Cure Costs with respect to any Assumed Contract or Assumed Lease exceeds the amount set forth with respect to such Assumed Contract or Assumed Lease on Schedule 2.6(a) of the Disclosure Letter (which amount set forth on such Schedule 2.6(a) shall be deemed to be zero if no Cure Cost amount is set forth with respect to any Assumed Contract or Assumed Lease) (such excess, the "Excess Cure Cost"), the Purchase Price shall be reduced dollar-for-dollar for all purposes under this Agreement by the amount of the Excess Cure Cost; provided, further that, to the extent that the amount set forth on Schedule 2.6(a) of the Disclosure Letter with respect to any Assumed Contract or Assumed Lease exceeds (other than as a result of any offset of amounts that would otherwise constitute Cure Costs against amounts owing to any Seller by any counterparty to any such Assumed Contract or Assumed Lease) the actual amount of liability for Cure Costs with respect to such Assumed Contract or Assumed Lease (such excess, the "Available Credit"), the Sellers may reduce the aggregate amount of Excess Cure Costs with respect to other Assumed Contracts and Assumed Leases by the amount of the Available Credit; provided, further that the aggregate amount of Excess Cure

Costs following such reduction shall in no event be less than zero and the Available Credit may not be used by the Sellers to increase the Purchase Price (or any component thereof)), and those Liabilities arising in connection with the use or operation of the Purchased Assets solely after the Closing Date (collectively, the "Assumed Liabilities"), none of the Purchaser, any Purchaser Designee or any Affiliate of the foregoing shall assume, be deemed to assume or become obligated in any way to pay or perform (whether as a successor to any Seller or otherwise) any Liabilities of any of the Sellers or any of their respective Affiliates of any kind or nature, known, unknown, contingent or otherwise, whether direct or indirect, matured or unmatured (the foregoing, including the following, the "Excluded Liabilities"), which shall include Liabilities arising from or related to the following:

(a) any Liability arising out of facts or circumstances in existence prior to the Closing and from or related to any breach, default under, failure to perform, torts related to the performance of, violations of law, infringements or indemnities under, guaranties pursuant to and overcharges, underpayments or penalties on the part of the Sellers or any of their Affiliates under any Contract, agreement, arrangement or understanding to which any Seller or any of its Affiliates is a party prior to the Closing, including with respect to any Assumed Leases;

(b) any Liability arising from or related to any claim, action, arbitration, audit, hearing, investigation, suit, litigation or other proceeding (whether civil, criminal, administrative, investigative, or informal and whether pending or threatened or having any other status) against any Seller or its Affiliates, or related to the Purchased Assets or the Assumed Liabilities, pending or threatened or relating to facts, actions, omissions, circumstances or conditions existing, occurring or accruing prior to the Closing Date;

(c) any Liability arising from or related to the operation or condition of the Purchased Assets or the Assumed Liabilities prior to the Closing or facts, actions, omissions, circumstances or conditions existing, occurring or accruing prior to the Closing;

(d) any Liability arising from or related to the operation of the Business or any of the Sellers' products or services prior to the Closing Date, including any Liability relating to (i) design or manufacturing defects (whenever discovered, whether prior or after the Closing) and (ii) warranties, product liability, safety or other Liability, in the cases of clauses (i) and (ii), relating to any product sold or manufactured by any Seller or any of its respective Affiliates prior to the Closing;

(e) any Liability in respect of Indebtedness of any Seller;

(f) any Liability with respect to Service Providers, including (x) any Liability arising under or with respect to any Benefit Plan, and (y) any Liability of any Seller in respect of Service Providers, including collective bargaining agreements, pensions and post-employment medical and health benefits (including coverage mandated by the Consolidated Omnibus Budget Reconciliation Act and similar provisions of state law ("COBRA")), wages, other remuneration, holiday or vacation pay, bonus, severance (statutory or otherwise), separation, termination or notice pay or benefits, commissions, insurance premiums, Taxes, Liabilities or Actions for workers' compensation, Actions

- 16 -

under the Worker Adjustment and Retraining Notification Act (the "WARN Act") and all similar laws, and any other form of accrued or contingent compensation (including vacation, sick days, personal days or other leave entitlements), irrespective of whether such Liabilities or Actions are paid or made, as applicable, on, before or after Closing;

(g) any Liability attributable to, relating to or arising under (i) Environmental Laws, or (ii) any Contract or other arrangement for disposal or treatment of Hazardous Substances, or for the transportation of Hazardous Substances for disposal or treatment, or (iii) environmental contamination or remediation, in each case arising from or related to facts, actions, omissions, circumstances or conditions existing, occurring or accruing prior to the Closing, or (iv) for toxic torts arising as a result of or in connection with loss of life or injury to Persons (whether or not such loss or injury was made manifest on or after the Closing Date) or other harm caused or allegedly caused by exposure to Hazardous Materials present at, on, in, under adjacent to or migrating from the Purchased Assets;

(h) other than those that qualify as Assumed Liabilities hereunder, any Liability in respect of royalty payments to third parties or other fees or payments relating to the Purchased IP (other than any royalty payments or other fees or payments that are a function of unit sales or similar measure), whether arising before, on or after the Closing (it being agreed that all royalty payments to third parties or other fees or payments relating to the Purchased IP that are a function of unit sales or similar measure shall be prorated between the Sellers, on the one hand, and the Purchaser, on the other hand, based upon their respective portions of the total units sold or such similar measure);

(i) any Excluded Taxes;

(j) any Liability with respect to any Seller Broker Fee;

(k) any Liability under this Agreement or any documents or instruments executed and delivered pursuant to this Agreement;

(l) any Liability relating to or arising, whether before, on or after the Closing, out of or, or in connection with, any assets, properties and rights of the Sellers or any of their Affiliates (other than the Purchased Assets), including the Excluded Assets and the Excluded Agreements;

(m) Cure Costs with respect to any Excluded Agreements; and

(n) any Liability not expressly included among the Assumed Liabilities and specifically so assumed.

Section 2.6 Procedures for Assumption of Agreements; Delayed Transfer of Assets.

(a) (i) On or prior to the date hereof, the Sellers have delivered Schedule 2.6(a) of the Disclosure Letter to the Purchaser, which Schedule contains with respect to each Contract and Lease of any Seller, the Sellers' good-faith estimate of the amount required to be paid with respect to each Contract and Lease to cure all monetary defaults

- 17 -

Case: 14-51955   Doc# 148-1   Filed: 06/30/14   Entered: 06/30/14 13:44:57   Page 18 of 20

under such Contract or Lease to the extent required by Section 365(b) and otherwise satisfy all requirements imposed by Section 365(d) of the Bankruptcy Code (the actual amounts of such costs, the "Cure Costs"). Prior to the Hearing, the Sellers shall commence appropriate proceedings before the Bankruptcy Court and otherwise take all reasonably necessary actions in order to determine Cure Costs with respect to any Assumed Contract or Assumed Lease entered into prior to the Petition Date, including, the right (subject in each case upon prior consultation in good faith with the Purchaser) to negotiate in good faith and litigate, if necessary, with any Contract or Lease counter-party the Cure Costs needed to cure all monetary defaults under such Contract or Lease. Notwithstanding the foregoing, prior to the Closing, the Purchaser may identify any Assumed Contract as one that Purchaser no longer desires to have assigned to it or a Purchaser Designee in accordance with Section 2.7.

(ii) At the Closing, the Sellers shall assume and assign to the Purchaser and/or, as applicable, one or more Purchaser Designees the Assumed Contracts and Assumed Leases, in each case pursuant to Section 365 of the Bankruptcy Code and the Assumption Order, subject to provision of adequate assurance by the Purchaser as may be required under Section 365 of the Bankruptcy Code and payment by the Purchaser of the Cure Costs in respect of Assumed Leases and Assumed Contracts. The Cure Costs in respect of all of the Assumed Leases and Assumed Contracts shall be paid by the Purchaser (subject in all cases to the limitations on the Purchaser's liability for such Cure Costs as set forth in Section 2.5). Sellers shall be solely responsible for the payment, performance and discharge when due of the Liabilities under the Purchased Assets, including all of the Assumed Contracts and Assumed Leases, arising prior to the Closing Date (other than the Cure Costs).

(b) Notwithstanding anything in this Agreement to the contrary, to the extent that the sale, transfer, assignment, conveyance or delivery or attempted sale, transfer, assignment, conveyance or delivery to the Purchaser and/or, as applicable, one or more Purchaser Designees of any asset that would be a Purchased Asset or any claim or right or any benefit arising thereunder or resulting therefrom is prohibited by any applicable Law or would require any Consent from any Governmental Authority or any other third party (after giving effect to the Sale Order, the Assumption Order and the Bankruptcy Code) and such Consents shall not have been obtained prior to the Closing, the Closing shall proceed without the sale, transfer, assignment, conveyance or delivery of such asset unless there is a failure of one or more of the conditions set forth in Article VI, in which event the Closing shall proceed only if each failed condition is waived by the Party entitled to the benefit thereof. In the event that any failed condition is waived and the Closing proceeds without the transfer or assignment of any such asset, then following the Closing, the Sellers shall use their reasonable best efforts, and the Purchaser shall cooperate with the Sellers, to obtain promptly such Consent. Pending the receipt of such Consent, the Parties shall reasonably cooperate with each other to provide Purchaser and the Purchaser Designees with all of the benefits of use of such asset free of any cost or expense. Once Consent for the sale, transfer, assignment, conveyance or delivery of any such asset not sold, transferred, assigned, conveyed or delivered at the Closing is obtained, the Sellers shall promptly transfer, assign, convey and deliver such asset to the

Purchaser and/or, as applicable, one or more Purchaser Designees at no additional cost or expense. To the extent that any such asset cannot be transferred or the full benefits or use of any such asset cannot be provided to the Purchaser and/or, as applicable, one or more Purchaser Designees following the Closing but in any event no later than the date that is ninety (90) days after the Closing pursuant to this Section 2.6(b), then, the Purchaser and the Sellers shall enter into such arrangements (including subleasing, sublicensing or subcontracting) to provide to the Parties hereto the economic (taking into account Tax costs and benefits) and operational equivalent of obtaining such Consent. The Sellers shall hold in trust for, and pay to the Purchaser and/or, as applicable, one or more Purchaser Designees, promptly upon receipt thereof, all income, proceeds and other monies received by the Sellers derived from its use of any asset that would be a Purchased Asset in connection with the arrangements under this Section 2.6(b).

(c) If, following the Closing, any Seller receives or becomes aware that it holds any asset, property or right which constitutes a Purchased Asset, then Sellers shall transfer such asset, property or right to the Purchaser and/or, as applicable, one or more Purchaser Designees as promptly as practicable for no additional consideration.

(d) If, following the Closing, the Purchaser receives or becomes aware that it holds any asset, property or right which constitutes an Excluded Asset, then Purchaser shall transfer such asset, property or right to the Sellers as promptly as practicable for no additional consideration.

Section 2.7 Additional and Eliminated Assumed Contracts. Notwithstanding anything in this Agreement to the contrary, the Purchaser may, in its sole and absolute discretion, amend or revise Schedules 1.2(a) and 1.2(b) of the Purchaser Schedule setting forth the Assumed Contracts and the Assumed Leases, respectively, in order to add any Contract or Lease to, or eliminate any Contract from, such Purchaser Schedule up to three (3) Business Days prior to the Closing Date (the "Designation Deadline") and, for any particular Assumed Contract or Assumed Lease that will be assumed in whole or in part by a Purchaser Designee, to identify such Purchaser Designee. Automatically upon the addition of any Contract to Schedule 1.2(a) of the Purchaser Schedule or Lease to Schedule 1.2(b) of the Purchaser Schedule, it shall be an Assumed Contract or Assumed Lease, as applicable, for all purposes of this Agreement. Automatically upon the deletion of any Contract from Schedule 1.2(a) of the Purchaser Schedule (any such deleted Contract, an "Eliminated Agreement"), it shall be an Excluded Agreement for all purposes of this Agreement, and no Liabilities arising thereunder shall be assumed or borne by the Purchaser. If the Purchaser indicates in writing to the Sellers after the Closing Date that it wishes to acquire a Contract or Lease of any Seller that was not an Assumed Contract or Assumed Lease on the Closing Date, the Sellers will use their reasonable best efforts to assign such Contract or Lease to the Purchaser; provided, however, that nothing herein shall be deemed or construed to obligate the Sellers to retain, or refrain from rejecting or terminating any Contract or Lease after the Designation Deadline that does not constitute an Assumed Contract or Assumed Lease. Notwithstanding anything to the contrary herein, the Sellers shall not be obligated to assume and assign any Assumed Contract or Assumed Lease with respect to which the Purchaser fails to satisfy the Bankruptcy Court as to adequate assurance of future performance (collectively, if any, the "Non-Assured Contracts").

- 19 -