Section 2.8   Purchase Price Deposit.

(a)   Within three (3) Business Days of the execution of this Agreement, the Purchaser shall deposit into an escrow account of the Sellers' counsel an earnest money deposit (the "Purchase Price Deposit") in the amount of $4,800,000 as security for the performance of the Purchaser's obligations under this Agreement. The Purchase Price Deposit, together with any interest thereon, shall be applied against the Purchase Price at Closing in accordance with the Deposit Escrow Agreement. Except as set forth in Section 2.8(b), if this Agreement shall be terminated pursuant to Section 8.1, the Purchase Price Deposit, together with any interest earned thereon, shall be delivered to the Purchaser in accordance with the terms of the Deposit Escrow Agreement.

(b)   If this Agreement is terminated by the Sellers pursuant to Section 8.1(d), the Purchase Price Deposit, together with any interest earned thereon, shall be delivered to the Sellers in accordance with the terms of the Deposit Escrow Agreement.

Section 2.9   Withholding. Notwithstanding anything in this Agreement to the contrary, the Purchaser and each Purchaser Designee, as applicable, shall be entitled to deduct and withhold from any amounts otherwise payable pursuant to this Agreement any amount as may be required to be deducted and withheld with respect to the making of such payment under applicable U.S. federal, state or local or foreign laws. To the extent that amounts are so deducted and withheld, such deducted and withheld amounts shall be treated for all purposes of this Agreement as having been paid to the Sellers or other Person in respect of which such deduction and withholding was made.

## ARTICLE III

## COURT APPROVAL

Section 3.1   Bid Protections. The Sellers have filed with the Bankruptcy Court the Sale Procedures Motion seeking approval from the Bankruptcy Court to implement certain bidding procedures (as set forth in the Sales Procedures Motion) and the Parties have agreed to certain supplemental bidding procedures, as set forth in the proposed Sale Procedures Order attached hereto, to, among other things, provide for the Sellers to conduct an auction (the "Auction") to enable additional qualified prospective bidders to bid for the Purchased Assets, and the Sellers shall adhere to such bidding procedures. The Sellers and the Purchaser agree, and the Sale Order shall reflect the fact that, the provisions of this Agreement, including this Article III and Section 8.3, are reasonable, were a material inducement to the Purchaser to enter into this Agreement and are designed to achieve the highest or best offer for the Purchased Assets.

Section 3.2   The Supplemental Sale Procedures Motion and Order; Related Matters. The Sellers shall file a motion with the Bankruptcy Court within one (1) Business Day of this Agreement being executed by the Parties (the "Supplemental Sale Procedures Motion") seeking the entry of the Sale Procedures Order. The Sellers will use their reasonable best efforts to cause the Bankruptcy Court to enter the Sale Procedures Order as soon as practicable after the filing of the Supplemental Sale Procedures Motion. The Sellers shall consult with the Purchaser and its Representatives concerning the Sale Procedures Order, the Sale Order, the Assumption Order,

- 20 -

any other Orders of the Bankruptcy Court relating to the transactions contemplated herein, and the bankruptcy proceedings in connection therewith, and provide Purchaser with copies of applications, pleadings, notices, proposed Orders and other documents relating to such proceedings as soon as reasonably practicable but in any event at least three (3) Business Days prior to making any such filing or submission to the Bankruptcy Court. The Sellers acknowledge and agree that the Purchaser and its Affiliates have expended considerable time and expense in connection with this Agreement, and the negotiation thereof, and the identification and quantification of assets to be included in the Purchased Assets. In consideration therefor, the Supplemental Sale Procedures Motion shall include a request from the Sellers that the Bankruptcy Court approve the Reimbursable Expenses (solely to the extent payable under this Agreement) as administrative priority expenses under sections 503(b) and 507(a)(1) of the Bankruptcy Code pursuant to the Sale Procedures Order.

Section 3.3  The Hearing and the Sale Order and Assumption Order. The Sellers shall request that the Hearing be scheduled as soon as reasonably practicable after the Auction and the Hearing with respect to the Sale Order shall in no event be held later than five (5) Business Days after the conclusion of the Auction and the Hearing with respect to the Assumption Order shall in no event be commenced later than then (10) Business Days after the conclusion of the Auction. At the Hearing with respect to the Sale Order, if the Purchaser is the successful bidder in the Auction, the Sellers shall immediately seek the entry of the Sale Order. The Sale Order and the Assumption Order shall, among other matters, but subject to the terms of this Agreement:

(a) approve this Agreement and the consummation of the Transactions upon the terms and subject to the conditions of this Agreement;

(b) find that, as of the Closing Date, the Transactions effect a legal, valid, enforceable and effective sale and transfer of the Purchased Assets to the Purchaser and/or, as applicable, one or more Purchaser Designees and shall vest Purchaser and/or, as applicable, one or more Purchaser Designees with title to the Purchased Assets free and clear of all Encumbrances (other than Permitted Encumbrances);

(c) find that the consideration provided by the Purchaser, or which the Purchaser caused to be provided by one or more Purchaser Designees, pursuant to this Agreement constitutes reasonably equivalent value and fair consideration for the Purchased Assets;

(d) (i) authorize the Sellers to assume and assign to the Purchaser and/or, as applicable, one or more Purchaser Designees each of the Assumed Contracts and Assumed Leases, and (ii) find that, subject to the terms of the Assumption Order, as of the Closing Date, the Assumed Contracts and Assumed Leases will have been duly assigned to the Purchaser and/or, as applicable, one or more Purchaser Designees in accordance with Section 365 of the Bankruptcy Code;

(e) find that the Purchaser or the Purchaser Designees are acquiring none of the Excluded Assets and assuming none of the Excluded Liabilities;

- 21 -

(f) find that the Purchaser or the Purchaser Designees are good-faith purchasers of the Purchased Assets pursuant to Section 363(m) of the Bankruptcy Code;

(g) find that none of the Purchaser, the Purchaser Designees or any Affiliate thereof engaged in any conduct that would cause or permit this Agreement or the consummation of the Transactions to be avoided, or costs or damages to be imposed, under Section 363(n) of the Bankruptcy Code;

(h) order that the Assumed Contracts and Assumed Leases will be transferred to, and remain in full force and effect for the benefit of the Purchaser and/or, as applicable, one or more Purchaser Designees, notwithstanding any provision in any such Contract or Lease or any requirement of applicable Law (including those described in Sections 365(b)(2) and (f) of the Bankruptcy Code) that prohibits, conditions, restricts or limits in any way such assignment or transfer;

(i) approve any other agreement to the extent provided by this Agreement;

(j) find that the Sellers gave due and proper notice of the Transactions to each party entitled thereto;

(k) find that Purchaser and each applicable Purchaser Designee has satisfied all requirements under Sections 365(b)(1) and 365(f)(2) of the Bankruptcy Code to provide adequate assurance of future performance of the Assumed Contracts and Assumed Leases;

(l) except as expressly set forth in the Sale Order, (i) find that none of the Purchaser, the Purchaser Designee(s) or any of their respective Affiliates or any assignees, transferees or successors thereof shall have any liability for any default, Action, Liability or other cause of action existing as of the Closing Date whether asserted or not, and (ii) enjoin and forever bar the non-debtor party or parties to each Assumed Contract or Assumed Lease from asserting against Purchaser or any Affiliate of the Purchaser or Purchaser Designee or any of the Purchased Assets any objection to the assumption and assignment of such non-debtor party's Assumed Contract or Assumed Lease (except to the extent any such objection was sustained by the Order of the Bankruptcy Court at or prior to the Hearing);

(m) find that, to the extent permitted by applicable Law, neither the Purchaser nor any Purchaser Designee or Affiliate thereof is a successor to any of the Sellers or the bankruptcy estate by reason of any theory of law or equity, and neither the Purchaser nor any Affiliate of a Purchaser nor any Purchaser Designee shall assume or in any way be responsible for any Liability of any Seller and/or the bankruptcy estate, except as otherwise expressly provided in this Agreement;

(n) provide that the Sellers are authorized to consummate the Transactions and to comply in all respects with the terms of this Agreement;

(o) be made expressly binding (based upon language satisfactory to the Purchaser) upon any trustee or other estate representative in the event of conversion of any

Case: 14-51955    Doc# 148-2    Filed: 06/30/14    Entered: 06/30/14 13:44:57    Page 3 of 19

of the Seller Chapter 11 Cases to chapter 7, or upon appointment of a Chapter 11 trustee in any Seller Chapter 11 Case;

(p) find that none of the Purchaser, the Purchaser Designee(s) or any of their respective Affiliates or any assignees, transferees or successors thereof shall have any liability for any of the Excluded Liabilities; and

(q) order that, notwithstanding the provisions of Federal Rules of Bankruptcy Procedures 6004(h) and 6006(d), the Sale Order and the Assumption Order are not stayed and are effective immediately upon entry.

## ARTICLE IV

## REPRESENTATIONS AND WARRANTIES

Section 4.1 Representations and Warranties of the Sellers. Except as set forth in the correspondingly numbered Schedules of the Disclosure Letter delivered as of the date hereof by the Sellers to the Purchaser (the "Disclosure Letter"), the Sellers, jointly and severally, hereby represent and warrant to the Purchaser as follows:

(a) Each Seller is duly organized, validly existing and, as of the date of this Agreement, in good standing under the laws of its jurisdiction of organization. Each Seller has all requisite power and authority to own, lease, develop and operate the Purchased Assets and to carry on the Business (subject to the provisions of the Bankruptcy Code). Each Seller is duly licensed or qualified to do business in each jurisdiction in which the properties owned or leased by it or the operation of its business makes such licensing or qualification necessary, except as has not been and would not reasonably be expected to be, individually or in the aggregate, material to the Sellers, the Business, the Purchased Assets or the Assumed Liabilities. The Sellers hold directly or indirectly all of the capital stock and other ownership interests of each of the entities set forth in Schedule 4.1(a)(i) of the Disclosure Letter (the "Non-Debtor Subsidiaries"). Other than as described in the preceding sentence, no Seller (i) owns, directly or indirectly, any capital stock or other ownership interest in any Person, or any securities convertible into or exchangeable or exercisable for any capital stock or other ownership interests in any Person, (ii) has any obligation to acquire any capital stock or other ownership interests in any Person, or any securities convertible into or exchangeable or exercisable for any capital stock or other ownership interests of any Person, or to make any investment in any Person, or (iii) is a party to any partnership, limited liability company, joint venture or similar agreement. True, accurate and complete descriptions of any and all of the assets (including contracts and leases), directors and employees of the Non-Debtor Subsidiaries as of the date hereof are set forth in Schedule 4.1(a)(ii) of the Disclosure Letter.

(b) Each Seller has all requisite corporate or limited liability company power and authority to execute and deliver this Agreement and to perform its obligations hereunder (subject, in the case of the obligation to carry out the Transactions, to the entry of the Sale Order and the Assumption Order). Subject to the entry of the Sale Order and the Assumption Order, the execution, delivery and performance by each Seller of this

Agreement and the consummation of the Transactions have been duly and validly authorized by all requisite corporate or limited liability company action on the part of each Seller and no other proceeding on the part of any Seller is necessary to authorize this Agreement and to consummate the Transactions. This Agreement has been duly and validly executed and delivered by each Seller and (assuming the due authorization, execution and delivery by the Purchaser) constitutes valid and binding obligations of each Seller enforceable against each Seller in accordance with its terms (subject, in the case of the obligation to carry out the Transactions, to the entry of the Sale Order and the Assumption Order).

(c) The execution, delivery and performance by each Seller of this Agreement does not, and the consummation by each Seller of the Transactions, upon entry of the Sale Order and the Assumption Order, will not, (i) conflict with or result in the breach of any provision of the organizational documents of any Seller, (ii) conflict with, violate or result in the breach by any Seller of any applicable Law, (iii) require any Seller to make any filing with or give notice to, or obtain any Consent from, any Governmental Authority, other than the Sale Order and the Assumption Order, (iv) conflict with, violate, result in the breach or termination of or the loss of a benefit under, or constitute (with or without notice or lapse of time or both) a default (or give rise to any right of termination, cancellation, payment or acceleration) or adverse modification of any terms or rights under, any Contract, Lease or Permit (subject, in the case of the assumption and assignment to the Purchaser or any Purchaser Designee of any Assumed Contract or Assumed Lease or Permit that by its terms requires consent to assignment, to the entry of the Sale Order and the Assumption Order and the terms and conditions of this Agreement), or (v) result in any Encumbrance (except for any Permitted Encumbrance) on any of the Purchased Assets; in the case of each of subclauses (ii), (iv) and (v), except as would not reasonably be expected to have, individually or in the aggregate, a Material Adverse Effect.

(d) Other than (i) the Purchaser, (ii) pursuant to any bids made by any Person in connection with the Auction, or (iii) prior to the Closing Date, any Seller, no Person has any written or oral agreement or option, right of first refusal, right of first offer, right of first negotiation or similar right for the purchase, sale, use or other disposition of all or any of the Purchased Assets.

(e) Schedule 4.1(e) of the Disclosure Letter sets forth a complete and accurate list of all Leases with respect to any real property (collectively, the "Leased Real Property"). No Seller or any of its Subsidiaries leases, subleases or has any other occupancy contracts or interests with respect to or governing any real property or occupies any real property other than the Leased Real Property, except in accordance with the agreements set forth in Schedule 4.1(e) of the Disclosure Letter with respect to Leased Real Property, including any options or rights of first refusal, first offer or first negotiation to lease not contained in the Leases. No Person that is not a Seller has any right to possess, use or occupy the Leased Real Property. A Seller has (x) a good and valid leasehold interest in the Leased Real Property and (y) good and valid title to, or a valid leasehold interest in, all Equipment, Improvements and other material tangible personal property constituting Purchased Assets, free and clear of Encumbrances (except Permitted Encumbrances). The Sellers have, and, immediately prior to the Closing, will have, and, upon delivery to

the Purchaser or the Purchaser Designees on the Closing Date of the instruments of transfer contemplated by the required closing deliveries, and subject to the terms of the Sale Order and the Assumption Order, the Sellers will thereby transfer to the Purchaser, good and marketable title to, or, in the case of property leased by the Sellers, a good and valid leasehold interest in, all of the Purchased Assets material to the Business as presently being conducted, free and clear of all Encumbrances, except for Permitted Encumbrances. The Purchased Assets constitute all assets used or held for use by the Sellers and their Affiliates in, and necessary and sufficient for, the operation of the Business as presently operated and as historically conducted prior to the Petition Date. None of the Sellers or any of their Subsidiaries owns any real property nor any options or rights of first refusal, first offer or first negotiation to acquire ownership of any real property.

(f) Each Permit is in full force and effect, each Seller is in compliance with its terms and conditions, all required renewal applications have been timely filed, no written notice has been received by the Sellers or any of its Affiliates from a Governmental Authority to revoke any Permit and no proceeding is pending or, to the Knowledge of the Sellers, threatened to revoke or limit any Permit.

(g) Since January 1, 2010, each Seller and each of its Subsidiaries has been in compliance with all applicable Laws relating to anti-bribery or anticorruption or that otherwise prohibits the corrupt payment to any government or public officials, including the U.S. Foreign Corrupt Practices Act of 1977, as amended. Since January 1, 2010, each Seller and each of its Subsidiaries has been in compliance with all other applicable Laws except for such non-compliance that has not been, and would not reasonably be expected to be, individually or in the aggregate, material to the Sellers, the Business, the Purchased Assets or the Assumed Liabilities. No Seller or any of its Affiliates has received a written notice (or, to the Knowledge of Sellers, non-written) of any investigation or review by any Governmental Authority with respect to the Purchased Assets or the Leased Real Property that is pending, or, to the Knowledge of the Sellers, threatened. Except for the Seller Chapter 11 Cases and as set forth on Schedule 4.1(g)(i) of the Disclosure Letter, there is no Action or Order pending, outstanding or, to the Knowledge of the Sellers, threatened against any Seller or any of its Subsidiaries that (a) seeks to restrain or prohibit or otherwise challenge the consummation, legality or validity of the Transactions or (b) would reasonably be expected to be material to the Purchased Assets or Assumed Liabilities. Since January 1, 2010, there has not been made or, to Knowledge of the Sellers, threatened, any product liability or other product-related claims by any third party arising from the sale, design, distribution or manufacturing, or with respect to the safety of, any product of the Business and, to Knowledge of the Sellers, there are no material safety concerns with respect to any product of the Business.

(h) Schedule 4.1(h)(i) of the Disclosure Letter sets forth as of the date of this Agreement a true and complete list of the following Contracts (other than purchase orders (to the extent less than one (1) year in duration), Leases and invoices (to the extent less than sixty (60) days in duration)) relating to the Business to which any Seller is a party or is bound (the "Material Contracts"): (1) any Contract with any supplier or customer of any Seller or any other Person pursuant to which the Sellers would reasonably expect to make or receive aggregate payments, or otherwise involves consideration with a value, in

- 25 -

excess of $200,000 in any calendar year; (2) any Contract containing any future capital expenditure obligations of any Seller (or otherwise relating to the Business) in excess of $200,000, in each case other than any such Contract relating solely to the M5 business; (3) any joint venture, partnership or other similar agreement involving co-investment between any Seller with a third party; (4) any Contract containing covenants that would restrict or limit in any material respect the ability of the Purchaser or its Affiliates after the Closing to compete in any business or with any Person or in any geographic area or that provides for "most favored nations" terms; (5) any Contract pursuant to which any Seller is the licensee or licensor of material Intellectual Property Rights relating to the Business, other than (A) off-the-shelf software license agreements with one-time or annual licensing fees of less than $50,000, (B) purchase orders containing licensing grants as part of such order's standard terms and conditions and (C) software license agreements included as a component of customer agreements; (6) any Contract for the sale, transfer or acquisition of any of the assets, capital stock or businesses of any Seller (other than, in the case of sales or transfers of inventory in the ordinary course of business consistent with past practice) or for the grant to any Person of any preferential rights to purchase any of the assets, capital stock or businesses of any Seller, in each case under which there are material outstanding obligations; (7) any Contract under which any Seller has continuing material indemnification obligations to any Person, other than those entered into in the ordinary course of business consistent with past practice; and (8) all Leases. Except (i) as set forth in Schedule 4.1(h)(ii) of the Disclosure Letter (including any Cure Costs with respect thereto) and (ii) solely as a result of the commencement of the Seller Chapter 11 Cases, (I) no Seller is, and there has not been any written claim or allegation (or, to the Knowledge of Sellers, non-written) by any Person that any Seller is, in breach or default under any Material Contract, and there exists no, and there has not been any written claim or allegation (or, to the Knowledge of Sellers, non-written) by any Person that there exists any, event or condition which (with or without notice or lapse of time or both) would result in a breach or default by any Seller under any Material Contract, and (II) to the Knowledge of the Sellers, no other party to any Material Contract is in breach or default thereunder. Except (x) as set forth in Schedule 4.1(h)(iii) of the Disclosure Letter and (y) solely in relation to the commencement of the Seller Chapter 11 Cases, as of the date hereof, no party to a Material Contract has provided any Seller with written notice (or, to the Knowledge of Sellers, non-written) that it intends to cancel, terminate, fail to renew or reduce business conducted under any Material Contract. Except as set forth in Schedule 4.1(h)(iv) of the Disclosure Letter, each of the Material Contracts is in full force and effect and is valid and binding on the Seller party thereto and, to the Knowledge of the Sellers, each other party thereto. The Sellers have made available to the Purchaser complete and accurate copies of each Material Contract.

(i)     Upon consummation of the Transactions, the Sellers shall have incurred no Liability for brokerage or finders' fees or agents' commissions or other similar payment in connection with the Transactions (a "Seller Broker Fee"), except for any Seller Broker Fee payable to Gerbsman Partners. None of the Purchaser nor any Affiliate of the Purchaser will have any Liability in connection with any Seller Broker Fee.

(j)     Except as set forth in Schedule 4.1(j) of the Disclosure Letter, the Sellers and the Business, including with respect to the use by the Sellers and the Business of the

Leased Real Property, are, and since January 1, 2010, have been in compliance with all Environmental Laws and Environmental Permits, except for such non-compliance that has not been, and would not reasonably be expected to be, individually or in the aggregate, material to the Sellers, the Business, the Purchased Assets or the Assumed Liabilities. The Sellers possess all Environmental Permits required for the operation of the Business and all such Environmental Permits may be transferred to the Purchaser subject only to payment of processing fees (if any) payable to the regulatory authorities. None of the Sellers or any of its Affiliates has received any written notice or other written communication from any Governmental Authority or any other Person regarding any revocation, withdrawal, non-renewal or intention not to renew, suspension, cancellation or termination of any such Environmental Permit. (i) No Seller is subject to any pending or, to the Knowledge of the Sellers, threatened Action alleging that a Seller may be in violation of any Environmental Law or Environmental Permit, or may have any Liability under any Environmental Law; and (ii) no Seller has stored, treated, disposed of, arranged for disposal or treatment of, transported, handled, generated, manufactured, distributed, or released any Hazardous Substance on, under or from any Leased Real Property, except in compliance with all Environmental Laws in all material respects. To the Knowledge of the Sellers, no environmental condition (including any release, spill, emission, discharge, leaking, pumping, pouring, dumping, injection, deposit, disposal, dispersal, leaching or migration of any Hazardous Substance) exists on or at any Leased Real Property, or any real property previously leased or used in connection with the Business, that would reasonably be expected to impose any Liability on any Seller or an Encumbrance on any of the Sellers' assets (including any Purchased Assets). Sellers have delivered or made available to the Purchaser complete and accurate copies of all material environmental reports, audits, and assessments prepared by or for the Sellers or any of their Affiliates or that are in the Sellers' possession, as well as all material correspondence with Governmental Authorities or other Persons relating to environmental conditions or environmental compliance matters at the facilities and the properties of any of the Sellers or concerning the operation of the Business.

(k) The Sellers have valid title to, or the right to use in connection with the Business, all of the Purchased IP and all other Intellectual Property Rights necessary and sufficient to conduct (or otherwise used in) the Business without any conflict with or infringement of the rights of any other Person in any material respect, and no Affiliate of any Seller other than the Sellers owns or licenses any Intellectual Property Rights. Schedule 4.1(k)(i) of the Disclosure Letter sets forth a true and complete list of all U.S. or foreign Intellectual Property Rights owned (whether in whole or in part) by or licensed to the Sellers that are issued, pending or registered, including all registered Purchased IP (marked as such), in each case indicating which Seller owns or has rights to use such Intellectual Property Rights and with respect to which businesses of the Sellers such Intellectual Property Rights are used or are relevant. Except as set forth in Schedule 4.1(k)(ii) of the Disclosure Letter, the Sellers have all right, title and interest in and to the Intellectual Property Rights designated as owned by the Sellers in Schedule 4.1(k)(i) of the Disclosure Letter, free and clear of all Encumbrances (other than Permitted Encumbrances). All current and former employees of the Sellers or any of their Affiliates have assigned to the Sellers all Purchased IP that such employees have created while in the scope of their employment, including copyrights in works made for hire and patents. Ex-

cept as set forth in Schedule 4.1(k)(iii) of the Disclosure Letter, all registered Intellectual Property Rights of the Sellers are in full force and effect, and have not been abandoned or passed into the public domain, and all necessary registration, maintenance and renewal documentation and fees in connection with such Intellectual Property Rights have been timely filed with the appropriate authorities and paid. The Sellers have in place commercially reasonable policies and procedures, consistent with industry standards, to maintain the secrecy of all trade secrets included in their Intellectual Property Rights. The Sellers are not using any registered Intellectual Property Rights in a manner that would reasonably be expected to result in the cancellation or unenforceability of such Intellectual Property Rights. There are no Actions pending, or, to the Knowledge of the Sellers, threatened, with respect to the Intellectual Property Rights of any Seller or which are otherwise used in the Business. There is no Action pending, or to the Knowledge of the Sellers, threatened that challenges the validity of ownership or use of any Purchased IP and there exists no state of facts and circumstances that would result in any such challenge that is material to the Business, the Purchased Assets or the Purchased IP being successful or which would be reasonably likely to result in a material liability. To the Knowledge of the Sellers, no third party's operations or products infringe on the Purchased IP. The operation of the Business does not infringe on the Intellectual Property Rights of any other Person except as would not reasonably be expected to be, individually or in the aggregate, material to the Sellers, the Business, the Purchased Assets or the Assumed Liabilities. Since January 1, 2010, no Seller has received or, to the Knowledge of the Sellers, been threatened with any written claim of infringement with respect to any Purchased IP. No Seller is using any Purchased IP or other Intellectual Property Rights in a manner that would reasonably be expected to result in the cancelation or unenforceability of such Purchased IP or other Intellectual Property Rights.

(l) Upon the consummation of the Closing, the Purchaser or the Purchaser Designees shall succeed to all of the Sellers' rights and interest in or under the Purchased IP that is necessary or appropriate for the operation of the Business, and all of the Sellers' rights under the Intellectual Property Rights that constitute the Purchased IP shall be exercisable by the Purchaser or the Purchaser Designees to the same extent as by the Sellers prior to the Closing. The execution, delivery and performance by the Sellers of this Agreement, and the consummation of the Transactions will not give rise to any right of any third party to terminate or re-price or otherwise modify any of the rights or obligations under any agreement under which any right or license of or under any of the Sellers' Intellectual Property Rights is granted to or by any of the Sellers.

(m) Subject to the entry of the Sale Order and the Assumption Order, the Sellers have complied with all requirements of the Bankruptcy Code and Federal Rules of Bankruptcy Procedure in connection with obtaining approval of the sale of the Purchased Assets (including the assumption and assignment to the Purchaser and/or, as applicable, one or more Purchaser Designees of any Assumed Contracts and the Assumed Leases) to the Purchaser and/or, as applicable, one or more Purchaser Designees pursuant to this Agreement.

(n) The Financial Statements present fairly in all material respects, the consolidated financial condition of CEP as of the dates set forth therein, and the consolidated

results of operations and cash flows for the periods covered thereby, in conformity with GAAP (subject, in the case of the Unaudited Financial Statements, to the absence of notes and normal year-end audit adjustments and to any other adjustments expressly set forth therein).

(o) [RESERVED.]

(p) The Sellers have provided to the Purchaser on the date hereof, in writing, a true and correct list of each current employee of the Sellers as of no more than five (5) Business Days prior to the date of this Agreement, with such list indicating each employee's job title, status (active or on statutory or employer approved leave and full-time or part-time), annual current salary or wage rate, incentive compensation for performance year 2013, business location, exempt/non-exempt status under the Fair Labor Standards Act (as classified by the Sellers), job band, annual vacation entitlement, accrued and unused vacation, paid time off and sick leave, applicable incentive plan and date of hire (original and most recent as applicable). Such list shall be updated by the Sellers following the date hereof and provided to the Purchaser on dates that are mutually agreed to by the Purchaser and Sellers. Sellers have provided Purchaser with a copy of each Benefit Plan and each associated summary plan description.

(q) Except as set forth on Schedule 4.1(q) of the Disclosure Letter, none of the Sellers or any of their Subsidiaries is party to a collective bargaining, works council, or similar agreement. No labor organization or group of employees of the Sellers or any of their Subsidiaries has made a pending demand for recognition or certification, and there are no representation or certification proceedings or petitions seeking a representation proceeding presently pending or threatened to be brought or filed, with the National Labor Relations Board or any other labor relations tribunal or authority. There are no organizing activities, strikes, work stoppages, slowdowns, lockouts, unfair labor practices, material arbitrations or material grievances, or other material labor disputes pending or threatened against or involving the Sellers or any of their Subsidiaries. Each of the Sellers and their Subsidiaries is in compliance with all applicable laws and collective bargaining agreements in respect of employment and employment practices, terms and conditions of employment, wages and hours and occupational safety and health.

Section 4.2 Representations and Warranties of the Purchaser. The Purchaser represents and warrants to the Sellers as follows:

(a) The Purchaser is duly organized, validly existing and in good standing under the laws of its jurisdiction of organization.

(b) The Purchaser has all requisite power and authority to execute and deliver this Agreement and to perform its obligations hereunder (subject, in the case of the obligation to carry out the Transactions, to the entry of the Sale Order and the Assumption Order). The execution, delivery and performance by the Purchaser of this Agreement and the consummation of the Transactions have been duly and validly authorized by all requisite corporate action on the part of the Purchaser, and no other corporate proceeding on the part of the Purchaser is necessary to authorize this Agreement and to consummate the

- 29 -

Case: 14-51955    Doc# 148-2    Filed: 06/30/14    Entered: 06/30/14 13:44:57    Page 10 of 19

Transactions. This Agreement has been duly and validly executed and delivered by the Purchaser and (assuming the due authorization, execution and delivery by all parties hereto and thereto other than the Purchaser) constitutes (or will constitute) valid and binding obligations of the Purchaser, enforceable against the Purchaser in accordance with its terms (subject, in the case of the obligation to carry out the Transactions, to the entry of the Sale Order and the Assumption Order).

(c) The execution, delivery and performance by the Purchaser of this Agreement does not, and the consummation by the Purchaser of the Transactions will not (i) conflict with or result in the breach of any provision of the organizational documents of the Purchaser, (ii) conflict with, violate or result in the breach by the Purchaser of any applicable Law or (iii) require the Purchaser to make any filing with or give notice to, or obtain any Consent from, any Governmental Authority, other than the Sale Order and the Assumption Order and, if required, any clearance under the antitrust laws of the Republic of Korea, in the case of each of clauses (i), (ii) and (iii), except as would not reasonably be expected to materially adversely affect Purchaser's ability to consummate the transactions contemplated hereby.

(d) The Purchaser has not incurred any Liability for brokerage or finders' fees or agents' commissions or other similar payment in connection with the Transactions that would be payable by any Seller (a "Purchaser Broker Fee").

(e) The Purchaser acknowledges and affirms that it has completed its own independent investigation, analysis and evaluation of the Purchased Assets, that it has made all such reviews and inspections of the Purchased Assets as it deems necessary and appropriate, and that in making its decision to enter into this Agreement and consummate the Transactions, it has relied on its own investigation, analysis, and evaluation with respect to all matters without reliance upon any express or implied representations or warranties except as expressly set forth in this Agreement.

(f) The Purchaser will have, at the Closing, the resources and capabilities (financial or otherwise) to perform its obligations hereunder, including payment of the Purchase Price. The Purchaser has not incurred any obligation, commitment, restriction or liability of any kind that would materially impair the Purchaser's ability to satisfy its payment and funding obligations under this Agreement.

## ARTICLE V

## COVENANTS

Section 5.1 <u>Interim Covenants of the Sellers</u>. Between the date hereof and the Closing Date, except (1) as required by Law (including the Bankruptcy Code), (2) as otherwise expressly contemplated by this Agreement, (3) with the prior written consent of the Purchaser and (4) as specifically required by any Order of the Bankruptcy Court (including the Sale Procedures Order), the Sellers shall conduct the Business in the ordinary course of business as the same is being conducted as of the date of this Agreement in the Seller Chapter 11 Cases and, without limiting the generality of the foregoing in any respect, shall:

- 30 -

Case: 14-51955   Doc# 148-2   Filed: 06/30/14   Entered: 06/30/14 13:44:57   Page 11 of 19

(a) use reasonable best efforts to maintain the Permits and the confidentiality, integrity and use of the Purchased Assets, preserve the goodwill and business relationships of the Business (with respect to the preservation of goodwill and business relationships, to the extent possible taking into account the conduct of the Business in the ordinary course as of the date of this Agreement in the Seller Chapter 11 Cases) and cause the conditions in Section 6.1 to be satisfied;

(b) manage and maintain the Purchased Assets and the Assumed Liabilities in the ordinary course of business consistent with past practice (to the extent possible taking into account the conduct of the Business in the ordinary course as of the date of this Agreement in the Seller Chapter 11 Cases);

(c) (i) perform in all material respects all of its postpetition obligations under the Contracts and Leases that have been identified as Assumed Contracts and the Assumed Leases as of the Designation Deadline, as and when such obligations become due (provided that nothing in this clause (i) shall obligate the Sellers to make any payment in respect of any prepetition obligation); (ii) not grant (whether before or after the Designation Deadline) any Consent under any Contracts or Lease that have been identified as Assumed Contracts or Assumed Leases as of the Designation Deadline; (iii) not modify or amend in any material respect or terminate, repudiate or reject any Material Contract, Assumed Contract or Assumed Lease, or enter into any Lease or material Contract; and (iv) not enter into any Contract the effect of which would be to grant to a third party any license to use or other rights with respect to or relating to any Purchased IP;

(d) comply with all applicable Laws in all material respects;

(e) maintain the Books and Records in the ordinary course of business consistent with current practice;

(f) not directly or indirectly (including by operation of law or through any merger, consolidation, reorganization, issuance of securities or rights, license, lease, encumbrance or otherwise) sell, pledge, assign, transfer, lease, convey, license, or cause, permit or suffer the imposition of any Encumbrance (except for Encumbrances that will be fully discharged pursuant to the Sale Order) on, or otherwise dispose of any of the Purchased Assets;

(g) not authorize, declare or pay any dividends on or make any distribution with respect to its outstanding shares of capital stock (whether in cash, assets, stock or other securities);

(h) not pay or disburse any funds other than as provided for in the budget of the Sellers set forth on Schedule 5.1 of the Disclosure Letter;

(i) not enter into any (i) settlement agreement with a third party or Governmental Authority or (ii) consent decree with a Governmental Authority unless such agreement or decree does not impose any obligations, financial or otherwise, or any Encumbrances or restrictions on, the Purchaser or any of its Affiliates or on the Business or any of the Purchased Assets;

(j) not take any action with respect to Taxes or Tax matters that could reasonably be expected to result in an Encumbrance (other than Encumbrances that will be fully discharged pursuant to the Sale Order) on the Purchased Assets or an increase in the Tax Liability of the Purchaser or any of its Affiliates;

(k) not convert the Seller Chapter 11 Cases into a liquidation proceeding under chapter 7 of the Bankruptcy Code;

(l) not fail to make any filing, pay any fee, or (to the extent possible taking into account the conduct of the Business in the ordinary course as of the date of this Agreement in the Seller Chapter 11 Cases) take any other action consistent with past practice of the Sellers (including, after consultation with the Purchaser, responding to assertions of invalidity by third parties) as necessary to maintain the ownership, validity and enforceability of any Purchased Asset, the failure of which would reasonably be expected to be material to the Business, the Purchased Assets or the Purchased IP;

(m) not enter into any assignment, sublease, amendment, modification, renewal, extension or surrender or termination of any Leases;

(n) not terminate the employment of any employee, other than for cause;

(o) not enter into any agreement (whether written or oral) to do or grant any option or right of first refusal, offer or negotiation with respect to, any of the foregoing, or authorize any of the foregoing; and

(p) not settle or adjust any dispute or claim in respect of trade account or other receivable outside of the ordinary course of business.

Section 5.2    Closing Documents. The Parties shall proceed diligently and in good faith to attempt to finalize, on or before the Closing Date or such earlier date as may be expressly set forth herein, the contents of all Closing Documents to be executed and delivered by the Sellers and the Purchaser that are not included as exhibits hereto.

Section 5.3    Matters Requiring Notice.

(a) The Sellers shall, promptly and in any event within three (3) Business Days of receipt thereof, provide to the Purchaser a copy of any notices of any breach or default that any Seller receives in respect of any Contract or Lease, or any notices that it receives with respect to any Permit from a Governmental Authority, any notices of a breach or default under any Contract or Lease that any Seller sends to another Person. The Sellers shall notify the Purchaser as promptly as practicable after becoming aware of any event, development or condition that would, individually or in the aggregate, reasonably be expected to have a Material Adverse Effect.

(b) The Sellers, on the one hand, and the Purchaser, on the other hand, shall promptly notify the other of:

- 32 -

(i) any notice or other communication received by any Seller or the Purchaser (as applicable) from any Person alleging that the Consent of such Person is or may be required in connection with the Transactions;

(ii) any inaccuracy of any representation or warranty of such Party contained in this Agreement at any time that would make such representation or warranty false in any material respect; and

(iii) any breach of any covenant or agreement of such Party contained in this Agreement at any time.

(c) Notwithstanding anything to the contrary in this Agreement, delivery of any notice pursuant to Section 5.3(b) and any access to or provision of information (including pursuant to Section 5.5) shall not modify any of the representations, warranties, covenants or agreements of the Parties (or rights or remedies with respect thereto) or the conditions to the obligations of the Parties under this Agreement.

Section 5.4 <u>Assets Held by Affiliates of the Sellers</u>. To the extent that any other Person that is an Affiliate of a Seller owns or has rights to any assets (including any Contracts or Leases) that is or would be a Purchased Asset if a Seller owned or had rights to such assets, the Sellers shall cause such Person to promptly transfer such asset, property, Contract, Lease or right to a Seller, and, upon such transfer, such asset, property or right shall be deemed to be a Purchased Asset under this Agreement for all purposes as if owned by the Sellers on and as of the date of execution hereof.

Section 5.5 <u>Access to Information/Confidentiality/Preservation of Books and Records</u>. From the date hereof until the earlier of (i) termination of this Agreement and (ii) the Closing, and subject to applicable Law, the Purchaser and its Representatives shall be entitled to make such investigation of the Sellers, the Purchased Assets and the Assumed Liabilities (including environmental inspections and testing, and including monitoring, identification, organization and accounting of Inventory with the reasonable assistance and cooperation of the Sellers (including so as to permit the Purchaser and its Representatives to count, identify, assess, toll, mark and move within the applicable facility Inventory), and access to employees as described herein) and such examination of the Books and Records as they reasonably request and to make extracts and copies of such Books and Records (which shall include making available to the Purchaser and its Representatives, monthly financial statements of the Sellers prepared by the Sellers in the ordinary course of business or in connection with Seller Chapter 11 Cases as soon as reasonably practicable (and in any event within two (2) Business Days) of the preparation thereof); <u>provided</u>, that the Purchaser shall reimburse the Sellers for their reasonable documented, out of pocket costs and expenses in connection with providing such access. Any such investigation and examination shall be conducted during regular business hours upon reasonable advance notice. In connection with the foregoing, the Sellers shall promptly provide the Purchaser and its Representatives, upon reasonable notice, access to the Sellers' employees and properties, offices and other facilities, and such other access to the Purchaser and its Representatives as the Purchaser may reasonably request from time to time to facilitate the Transactions. The Sellers shall promptly provide the Purchaser with access to any and all documents (and promptly advise the Purchaser of the content of any orally conveyed information) provided during the period from

the date hereof through the date of the Sale Order to any prospective purchasers of all or any part of the Purchased Assets not previously provided to the Purchaser. Any confidential information provided to the Purchaser shall be deemed Confidential Information under the Confidentiality and Non-Disclosure Agreement, dated May 16, 2014, between Doosan Corporation and CEP, and shall be subject to the terms thereof. Notwithstanding anything herein to the contrary, no access to, or examination of, any information or other investigation by the Purchasers shall be permitted to the extent that (i) it includes trade secrets or other proprietary information, in each case relating solely to an Excluded Asset, (ii) it is protected by attorney-client, work-product, or similar legal privilege or (iii) the disclosure of which is prohibited pursuant to applicable Law. In addition, without limiting the generality of the foregoing, within five (5) Business Days after the date hereof, the Sellers shall provide Purchaser with a list of all suppliers of any Seller or subcontractors of any Seller products (i) who are the sole or primary supplier of any significant product, service or other tangible or intangible property or license rights to the Sellers or (ii) to which any Seller or any such subcontractor made or incurred payments or obligations of $200,000 or more during the twelve month period ended April 31, 2014.

Section 5.6 Use of Name. As soon as reasonably practicable after the Closing (and in no event later than five (5) Business Days after the Closing), the Sellers and their Affiliates shall take all necessary action to cease using the "ClearEdge Power" name and any derivatives thereof.

Section 5.7 Confidentiality. From and after the Closing, the Sellers and their Affiliates shall keep strictly confidential and not disclose to any party any information relating to the Business, Purchased Assets or the Assumed Liabilities (for the avoidance of doubt, excluding any information relating solely to the Excluded Assets or the Excluded Liabilities), including information contained in any Retained Books and Records, unless required by Law or as may be strictly necessary in connection with the Seller Chapter 11 Cases.

Section 5.8 Required Approvals.

(a) Prior to the Closing, upon the terms and subject to the conditions of this Agreement, and except as contemplated by this Agreement, the Sale Procedures Order, the Sale Order or the Assumption Order, the Parties shall take, or cause to be taken, all actions, and do, or cause to be done all things necessary, proper or advisable to consummate the Closing and the Transactions as promptly as reasonably practicable including the preparation and filing of all forms, registrations and notices required pursuant to applicable Law to be filed to consummate the Closing and the Transactions and the taking of such actions as are necessary to obtain any requisite approvals, authorizations, Consents, releases, orders, licenses, Permits, qualifications, exemptions or waivers by any third party or Governmental Authority. Without limiting the generality of the foregoing, the Parties shall cooperate and use their respective reasonable best efforts to cause the necessary initial application and filing with the Fair Trade Commission of the Republic of Korea required in connection with the KFTC Approval to be made as promptly as practicable (and in no event later than on the tenth (10th) Business Day following the date of this Agreement). Each of the Parties shall cooperate in good faith and consult with each other in connection with all communications and strategy relating to all communication with any Governmental Authority (other than the Bankruptcy Court) regarding the

- 34 -

Transactions. In furtherance of (and without limiting the generality of, in any respect) the foregoing, each of the Sellers, on the one hand, and the Purchaser, on the other, shall (i) permit the other Party to review in draft any communication to be submitted by such Party or its Representatives and consult with the other Party in advance of any in-person or telephonic meeting or conference with any Governmental Authority regarding the Transactions; (ii) give the other Party and its Representatives the opportunity to attend and participate in such meetings and conferences, to the extent not prohibited by such Governmental Authority (it being understood that the Purchaser shall provide such opportunity to the Sellers only upon request by the Sellers); and (iii) promptly inform the other Party of any oral communication with, and provide copies of written communication with, any Governmental Authority regarding the Transactions (it being understood that the Purchaser shall provide such information to the Sellers only upon request by the Sellers).

(b) The Parties shall use their reasonable best efforts to take all reasonable steps as may be necessary to obtain an approval or other Consent from, resolve any objection or assertion by, or resolve any action or proceeding by, any Governmental Authority, whether by judicial or administrative action, challenging this Agreement or the consummation of the Transactions under any antitrust or other regulatory Law. Notwithstanding the foregoing, the Purchaser will not be obligated to commit to the divestiture of any assets or business of the Purchaser (or any Affiliate of the Purchaser) or any Purchased Assets or to any limitations on the conduct of its or its Affiliates' businesses (whether before or after the Closing).

Section 5.9 Publicity. Except as required by applicable Law (including any Order by the Bankruptcy Court) or filings by the Sellers with, or in any proceeding before, the Bankruptcy Court, the Sellers shall not issue any press release, provide any notice to customers or suppliers (in the case of notice to customers or suppliers, other than in the ordinary course of business consistent with past practice), or make any public announcement concerning this Agreement or the Transactions without the Purchaser's consent, not to be unreasonably withheld; provided that the Sellers may issue any such press release or make any such public announcement in connection with the Auction after having provided the Purchaser at least one (1) Business Day to review and comment on such release or announcement (which comments shall be reasonably considered by the Sellers).

Section 5.10 [RESERVED].

Section 5.11 Benefit Plans.

(a) Sellers shall remain solely responsible for any and all Liabilities and obligations arising under the Benefit Plans, and Purchaser shall not assume or otherwise acquire any of the Benefit Plans. Neither the Purchaser, nor any Purchaser Designee nor any Affiliate of the Purchaser shall have any Liability whatsoever for (i) any compensation or other obligations purported to be owing to any Service Provider by any Seller or any of its Affiliates, including any severance, separation pay, worker's compensation, change of control payments or benefits, retention payments or any other payments or benefits arising in connection with the termination of such Service Provider's employment by or services to any Seller or any of its Affiliates before, on or after the Closing

Date, or (ii) any Action under WARN by any past or present Service Provider in connection with termination of employment with or services to any Seller and its Affiliates, including any plant closing or mass layoff.

(b) Effective upon the Closing Date, each of the Sellers hereby waives, either directly or by causing its Affiliates to waive, for the benefit of the Purchaser and its Affiliates, any and all restrictions, if any, in any Benefit Plan or Contract relating to (i) non-competition with any Seller or any of its Affiliates, or (ii) maintenance of confidentiality of any information for the benefit of any Seller or any of its Affiliates, in each case, with or covering any Service Provider who becomes a director, officer, employee, consultant or independent contractor of Purchaser or any of its Affiliates.

(c) Following the Closing, the Sellers shall retain all Liability to provide COBRA health care continuation coverage attributable to "qualifying events" with respect to any employee of the Sellers who does not become an employee of Purchaser or any of its Affiliates and his or her beneficiaries and dependents, whether occurring before, on or after the Closing Date, so that neither the Purchaser nor any of its Affiliates is required by applicable Law to provide COBRA continuation coverage to any of such employees, beneficiaries or dependents. The Sellers shall maintain in effect a group health plan for so long following the Closing as is necessary to ensure that they can satisfy their obligations under this paragraph

(d) The Sellers shall pay to the Service Providers all accrued but unpaid vacation and, if applicable, sick leave, for periods from and after the Petition Date and prior to the Closing Date (solely to the extent that claims for such payments would be entitled to priority under section 507 of the Bankruptcy Code) as soon as administratively practicable after the Closing Date or as required by applicable Law, but in no event more than five (5) Business Days after the Closing Date.

(e) Nothing in this Section 5.11 shall (i) be treated or construed as an amendment of, or undertaking to amend, any benefit plan or (ii) be construed to prohibit the Purchaser or any of its Affiliates from amending or terminating any benefit plan. The provisions of this Section 5.11 are solely for the benefit of the respective Parties and nothing in this Section 5.11, express or implied, shall confer upon any Service Provider, or legal representative or beneficiary thereof or other Person, any rights or remedies, including any right to employment or continued employment for any specified period, or compensation or benefits of any nature or kind whatsoever under this Agreement or a right in any Service Provider or beneficiary of such Service Provider or other Person under any benefit plan that such Service Provider or beneficiary or other Person would not otherwise have under the terms of such plan.

Section 5.12  Non-Competition; Non-Solicitation.

(a) From the Closing Date until the fifth (5th) anniversary thereof, the Sellers and each of their Affiliates (and any of their respective successors) shall not directly or indirectly engage or participate (including by facilitating, aiding or otherwise cooperating with any third party (including any former employee of any Seller or any of its Subsidiar-

ies)) in any business related to a Purchased Asset or license any Intellectual Property to any Person (other than Purchaser or its Affiliates) for use in any business related to the Purchased Assets.

(b) From the date hereof until the second (2nd) anniversary of the Closing Date, the Sellers and each of their Affiliates (and any of their respective successors) shall not hire or solicit for employment any employee of the Purchaser or its Affiliates or any of the Service Providers who become a director, officer, employee, consultant or independent contractor of Purchaser or any of its Affiliates; provided, however, the restrictions of this Section 5.12(b) shall not apply to any general solicitation in any newspaper, website or other publication, or through any search firm engagement which, in any such case, is not directed or focused on personnel employed by the Purchaser or any of its Affiliates or on the Service Providers who become a director, officer, employee, consultant or independent contractor of Purchaser or any of its Affiliates.

Section 5.13  Avoidance Actions. Neither the Sellers nor the Purchaser shall pursue any Avoidance Actions of any kind or nature against any Designated Party other than as a defense (to the extent permitted under applicable law) against any claim or cause of action raised by any Deisgnated Party as expressly provided in Article II.

Section 5.14  Sales Process. No Seller or its Affiliates shall (and the Sellers shall cause their and their Affiliates' Representatives not to) directly or indirectly, at any time prior to the entry of the Sales Procedures Order by the U.S. Bankruptcy Court, (i) initiate, solicit or knowingly encourage (including by way of furnishing information or assistance), or knowingly induce, the submission or announcement of any proposal or offer for any Competing Transaction or (ii) enter into any letter of intent, memorandum of understanding, asset sale agreement or other agreement, arrangement or understanding relating to any Competing Transaction. Notwithstanding the foregoing, nothing in this Agreement shall prohibit any Seller from (a) subject to Section 5.9, providing any Person with the bidding procedures for the sale of the assets and related documents (including this Agreement), answering questions about the bidding procedures for the sale of the assets, or announcing the execution of this Agreement or the Auction; (b) discussing, negotiating and entering into non-disclosure agreements relating to the sale of the Purchased Assets or amendments to existing non-disclosure agreements, in each case to the extent permitted by the requirements of the bidding procedures for the sale of the assets; or (c) providing access to the Sellers' electronic data room to Persons (and their representatives) who have entered into a non-disclosure agreement with the Sellers and responding to diligence requests of such Persons. From and after the entry of the Sales Procedures Order and until the entry of the Sale Order, no Seller shall take any of the foregoing restricted actions except pursuant to the Auction and in accordance with the Sales Procedures Order.

Section 5.15  Business Partners. The Sellers shall, following the request thereof by the Purchaser, seek and use their respective reasonable best efforts to arrange meetings and telephone conferences with material suppliers, customers, licensors, licensees or other business partners of the Sellers as may be reasonably requested by the Purchaser and necessary or appropriate for the Purchaser to coordinate transition of such Persons following the Closing. For the avoidance of doubt, the Purchaser shall be permitted to independently contact any customers, suppli-

ers, licensors, licensees or other business partners of any Seller in connection with or pertaining to any matter.

Section 5.16  Ability to use Certain Assets.  With respect to the Purchased Assets specifically identified on Schedule 5.16 of the Purchaser Schedule (the "Permitted Use Assets"), the Purchaser hereby grants the Sellers permission to use, from and after Closing and until the one hundred eightieth (180th) day following the Closing, the Permitted Use Assets, to the extent used, kept and handled by the Sellers with reasonable care as exercised in the ordinary course of the Sellers' business prior to the Petition Date, at no cost to the Sellers (other than the Sellers own costs and expenses, out of pocket or otherwise) solely for the purpose of concluding the Seller Chapter 11 Cases in an orderly and timely manner; provided, that the Sellers shall indemnify the Purchaser for any loss of or damage to the Permitted Use Assets to the extent caused by the use, keeping or handling of such Permitted Use Assets without a level of reasonable care as exercised in the ordinary course of the Sellers' business prior to the Petition Date.

Section 5.17  Korean Assets.  From the date hereof until three (3) Business Days prior to the Closing Date, the Purchaser may submit to the Sellers a written list setting forth any asset (including Intellectual Property Rights and Patent and IP Related Documentation, if any), property, Contract, Lease or right of ClearEdge Power International Service Korea LLC (f/k/a UTC Power International Service Korea LLC) ("CEPIS Korea") that it intends to acquire and assume ("Korean Assets"). The Sellers shall take all actions necessary to cause CEPIS Korea and any other applicable Seller or Subsidiary of Seller to sell, transfer, assign, convey or deliver to Purchaser any such Korean Assets, free and clear of any and all Encumbrances of any and every kind, nature and description, other than Permitted Encumbrances, for no additional consideration, pursuant to customary documents and instruments, acceptable to the Purchaser, necessary or appropriate to effect such transfer, assignment, conveyance and delivery to Purchaser pursuant to applicable Korean or other Laws. Any such Korean Assets shall be deemed Purchased Assets, Assumed Contracts and/or Assumed Leases, as the case may be, under this Agreement.

Section 5.18  SPE Assets.  To the extent that REF Investments, Ltd. (or its successors and/or assigns) makes a Sale Election in accordance with Section 2.4, the Sellers shall take all actions necessary to cause ClearEdge Power Finance, LLC to file a voluntary chapter 11 petition commencing a case consolidated for administrative purposes with the Seller Chapter 11 Cases and to sell, transfer, assign, convey or deliver to Purchaser all Encumbered Assets subject to such Sale Election, free and clear of any and all Encumbrances of any and every kind, nature and description for no additional consideration (other than the Supplemental Purchase Price set forth in Section 2.4), pursuant to customary documents and instruments, acceptable to the Purchaser, necessary or appropriate to effect such transfer, assignment, conveyance and delivery to Purchaser pursuant to applicable Laws. Any such Encumbered Assets shall be deemed Purchased Assets, Assumed Contracts and/or Assumed Leases, as the case may be, under this Agreement, provided, however, to the extent the performance of this covenant and the assignment, conveyance and delivery contemplated thereby cannot reasonably be accomplished by the Closing, the Closing shall nonetheless proceed as to all other Purchased Assets, the foregoing shall be completed as soon as reasonably practicable and the portion of the Supplemental Purchase Price attributable to such assets shall be delivered by the Purchaser to the Sellers concurrently with the completion of the foregoing (and not on the Closing Date).

Case: 14-51955    Doc# 148-2    Filed: 06/30/14    Entered: 06/30/14 13:44:57    Page 19 of 19